575 So.2d 967 (1990)
Geoffrey Dufton FOSTER, a Minor, BY Kevin C. Foster, as Father and Next Friend
v.
John L. BASS, M.D., Howard H. Nichols, M.D., University Hospital and Catholic Charities, Inc.
No. 07-CA-58991.
Supreme Court of Mississippi.
December 19, 1990.
Rehearing Denied March 6, 1991.
James P. Cothren, Robert G. Germany, Cothren & Pittman, Jackson, Vernon F. Glenn, McCoy Taylor & Glenn, Charleston, S.C., for appellant.
Rebecca Lee Wiggs, Steven D. Orlansky, Watkins & Eager, Jackson, for appellee.
EN BANC.
ANDERSON, Justice, for the Court:
This case allows this Court to grapple with the duties and responsibilities of a private adoption agency in placing children. Having determined that summary judgment was appropriate in the lower court, the Hinds County Circuit Court dismissed with prejudice the appellant's claim against the appellee. In the end we conclude that the trial court acted properly. Because of the significance of this case, we address the following issues presented to this Court:

CATHOLIC CHARITIES, INC. OWED A DUTY TO EXERCISE REASONABLE *968 CARE IN INVESTIGATING THE HEALTH OF GEOFFREY FOSTER AND IN ADVISING HIS PROSPECTIVE ADOPTIVE PARENTS OF ANY HEALTH PROBLEMS

CATHOLIC CHARITIES['] VIOLATION OF ITS DUTY TO THE FOSTERS WAS A PROXIMATE CAUSE OF THE INJURIES TO GEOFFREY
CATHOLIC CHARITIES SHOULD NOT HAVE BEEN GRANTED A SUMMARY JUDGMENT

Prior Proceedings
On May 5, 1986, Geoffrey Foster, by his father, Kevin C. Foster (hereinafter collectively Foster)[1] filed a complaint in the Hinds County Circuit Court. This complaint was filed against Drs. John L. Bass and Howard H. Nichols, University Hospital and Catholic Charities, Inc. In this complaint Foster alleged that the defendants were negligent in failing to have him tested for Phenylketonuria (PKU) either at the time of his birth or during the days following his birth. He also complained that the defendants failed to order and require PKU testing for him prior to his adoption when the medical information form attached to his adoption papers recognized the need for such testing and provided a place to record the results of the testing. In addition, Foster alleged that the defendants violated and deviated from the proper standards of care in his treatment and in providing necessary medical information concerning his condition prior to his adoption. In the end, according to Foster, these acts were negligent, and they were the proximate cause of his mental retardation, which is permanent and irreversible.
Answers and Defenses were filed by the various defendants. In particular, Catholic Charities denied that it was negligent and asserted that Foster's "complaint fail[ed] to state a claim upon which relief may be granted against [it.]" Catholic Charities, additionally, denied any negligence on its part which proximately contributed to Foster's mental retardation.
Extensive discovery subsequently was conducted, and on October 22, 1986, the trial court entered an order sustaining University Hospital's Motion to Dismiss based upon its defense of sovereign immunity and dismissing the hospital from the case with prejudice.
On January 22, 1988, the lower court entered a Final Judgment of Dismissal with Prejudice. This dismissal recognized that Foster had entered a settlement with Drs. Bass and Nichols. Prior to that, however, on October 29, 1987, Catholic Charities filed its motion for summary judgment stating, inter alia, "As an adoption agency and not a medical provider, Catholic Charities had no duty to test the plaintiff for PKU."
In his response to the summary judgment motion, Foster not only insisted that his complaint alleged negligence for failure to test, but it also alleged that Catholic Charities was "guilty of negligence in failing to require PKU testing, in failing to provide proper and necessary medical information and other acts of negligence."
After the parties were allowed to submit briefs on this motion and an extensive hearing was held, the trial court entered its order granting the motion for Catholic Charities based upon a finding:
that plaintiff has made no showing of evidence sufficient to create a genuine dispute of material fact as to whether Catholic Charities breached any duty it owed to the Foster's or that any breach proximately caused or contributed to the injuries complained of and, Catholic Charities, is therefore entitled to judgment as a matter of law.
Foster timely filed a motion to vacate or set aside the order granting the summary judgment motion. In this motion, Foster asked the trial court to set aside its order because:

*969 [t]he Motion did not raise the issues of whether Catholic Charities, Inc. had the duty to investigate the health of Geoffrey Dufton Foster, accurately record medical information regarding [Geoffrey], properly advise [his] treating physicians of his health history, including whether he had been tested for PKU and the results of such testing, if any, and to advise the prospective adoptive parents of the health of Geoffrey Dufton Foster ...
Also included with this motion was an affidavit of Elizabeth S. Cole, which stated that a "standard of care does exist for the fee paid private adoption agencies such as Catholic Charities ... [, and] in her opinion [this breach by Catholic Charities] was a proximate cause of injuries sustained by [Foster.]"
In response to this motion, the trial court entered an order upholding its order granting summary judgment stating its view that there is no evidence which would allow a reasonable jury to conclude that Catholic Charities breached a duty proximately causing Foster's injury. The court entered its Final Judgment in favor of Catholic Charities and dismissed Foster's complaint with prejudice. Foster timely filed his notice of appeal to this Court.

PRELIMINARY FACTS

What is PKU?[2]
Phenylketonuria (PKU) is a metabolic disease caused by an inherited defect in the enzyme, phenylalanine hydroxylase, which converts phenylalanine to tyrosine. Phenylalanine and tyrosine are important amino acids in body metabolism. For example, tyrosine is important in thyroid function, neurotransmitter function and melanin formation. In a normal person, 95% of the phenylalanine in his diet is converted to tyrosine. As soon as an infant begins to take in protein by mouth, its blood phenylalanine concentration rises.
PKU is an inherited, recessive condition, which means that both parents must be carriers of the PKU gene, thus creating a one-fourth chance of producing a PKU child. Approximately 1/10,000 births are PKU in European populations; therefore, 1/2,500 such couples exist, or 1/50 members of the population carry the PKU gene.[3] This is a very rare disorder, and the birth of a PKU child is nearly always unpredictable. There is no way to discover if the parents are carriers of the gene because there are no symptoms or indication of the disease and the children are born healthy. The most effective way to detect the disease is to organize programs that can test every infant shortly after birth.
In PKU, phenylalanine accumulates in the blood and body tissues because it cannot be converted to tyrosine. The excess phenylalanine causes severe brain damage resulting in severe mental retardation, and at times seizures, cerebral palsy and microcephaly. In the 1950's, Dr. Robert Guthrie developed a newborn test procedure which detects PKU. The test is a standardized simple method of detecting PKU, and it has been administered on a routine basis at the Mississippi Baptist Medical Center since 1965. Although the state recognized the need for conducting screening tests as early as 1979, the tests were not required until 1985. Cf. MISS. CODE ANN. § 41-21-203 (1972) (physician may provide) with § 41-21-203 (Supp. 1989) (physician shall provide).
Untreated PKU persons usually have intelligence quotients between 25-50, and many of these reside in state institutions for the retarded because of associative behavioral problems. "Early diagnosis and treatment, consisting merely of a change in the infants' diet can successfully prevent *970 all the clinical manifestation of the disease." Wachbroit, Making the Grade: Testing for Human Genetic Disorders, 16 Hofstra L.Rev. 583, 594 (1988).

STATEMENT OF THE FACTS
Kevin and Jean Foster were married in 1961. In 1963 they had their first child. Mrs. Foster had one miscarriage earlier and in 1969 she became pregnant again. This child, however, died at birth or shortly thereafter. Again Mrs. Foster became pregnant, and yet again, this pregnancy ended in a miscarriage. The Fosters then turned to adoption. On March 19, 1971, the Fosters made inquiry with Catholic Charities about the possibility of adopting a child. An intake interview was conducted by a staff social worker at Catholic Charities, and the Fosters submitted to Catholic Charities a written application to adopt a child. Thereafter, individual interviews were conducted with each of the Fosters. An Adoptive Home Study Report was compiled, and Catholic Charities concluded that the Foster's "seem very capable of providing a good home for an adoptive child."
Geoffrey was born on February 22, 1972, at the University Hospital in Jackson. Three days later, Geoffrey's natural mother executed a parent's or guardian's surrender to Catholic Charities. He remained in the hospital until February 28, 1972, when the Fosters obtained custody of him. While Geoffrey was in the hospital, Dr. John L. Bass was the resident in charge of care in the nursery. He was primarily and ultimately responsible for Geoffrey's care. Dr. Bass did not order a PKU test for Geoffrey because at that time there was no policy at University Hospital for performing PKU as a routine screening procedure.
Catholic Charities has never had a medical director or doctor on its staff. It has relied upon the physicians, who treat the children it places for adoption, to alert it to any medical problems or the needs the children may have.
When Catholic Charities placed Geoffrey with the Fosters, it gave them a standard child's medical information form. This form when completed contained information about the baby's race, sex, weight, length, blood type, pku, and other information.[4] This form was created by the adoption staff at Catholic Charities and maintained on each adoptive child. Catholic Charities gave this form to the parents to provide them with some medical history on the child. More importantly, however, this form indicates if there are any medical problems with the child, the adoptive parents are to give this form "to their own physician and provide medical care for the child." Catholic Charities does not actually order a copy of the child's hospital chart, but an adoption maternity worker reviews the records and copies the information onto the record. Catholic Charities did not order or maintain a copy of the hospital records on the children who were to be placed for adoption, and the Fosters were not furnished a copy of the hospital records on Geoffrey.
Two weeks after Geoffrey's birth, the Fosters took the information that they were provided to Dr. Howard Nichols. They also relayed to Dr. Nichols verbal information received from Catholic Charities. This information included that Geoffrey's natural mother was a teenager and that a vacuum extractor and possibly forceps were used during his delivery. Catholic Charities also had provided a Placement Health Examination Report, a standard form it created, to give to their treating pediatrician with instructions to have him complete the report and return it to the agency. Dr. Nichols completed the placement health examination report and returned it to Catholic Charities. He continued to follow Geoffrey until May 11, 1972. On June 9, 1972, Dr. Nichols wrote a letter certifying that Geoffrey was in "good health" and "physically and mentally competent for [adoption]." At no time did Dr. Nichols order or obtain a test for PKU.
Geoffrey's medical information form has a blank next to PKU. This blank does not indicate that Geoffrey was given the test. According to Dr. Nichols, he considered the *971 blank to mean that the test results had not been received as the results of the test may take up to two months. Dr. Nichols did not call Catholic Charities at any point after receiving the information form because, in his experience, usually the adoption agency would contact him to let him know if the test returned positive. Dr. Nichols did not call University Hospital to see if a PKU test had been ordered or if the results had been received because he did not know Geoffrey's birth name, the name of the physician who delivered him or the name of the physician who cared for him at the hospital.
Dr. Nichols, however, stated that he knew about PKU since the 1940's or 50's. As a matter of fact, he and several colleagues instituted a mandatory newborn PKU screening program at the Mississippi Baptist Medical Center in Jackson in 1965. Although it was not an expected procedure to do PKU testing from a doctor's office in 1972 as a screening procedure, Nichols insisted that had he known no PKU screen had been done on Geoffrey, he would have ordered one.[5]
On June 12, 1972, Geoffrey's adoption became final, and the Fosters paid the adoption fee required by Catholic Charities. Once the adoption was final, the Fosters moved to New Fairfield, Connecticut. Later, as a result of testing in 1976, Geoffrey was diagnosed as suffering from PKU. The doctor advised the Fosters that the damage done was permanent and irreversible. Geoffrey's chances for independent function were virtually non-existant, and he would need special help for the balance of his life.
Subsequently, Foster filed this suit and charged all the defendants jointly with failing to have him tested for PKU, failing to order and require PKU testing, violating and deviating from standards of care in treating him and failure to provide proper and necessary medical information.
Before proceeding with a discussion of the issues, some detailed discussion of at least one deposition is warranted. Dollie Hambrick, the present director of the adoption and maternity program, has been working with Catholic Charities since 1968 in various capacities. From 1968-71, Hambrick, in addition to performing other duties, worked with adoption and maternity. From 1981 until being promoted to Director, Hambrick worked as an adoption caseworker.
Hambrick acknowledged that Catholic Charities used Geoffrey's Medical Information Form. In fact, she admitted that she may have used the form to record medical information from the hospital records of infants to be placed for adoption, and it was given to the adopting parents. In this particular case, the line next to PKU was left bare.
According to Hambrick, the information that the child's medical information form sought to record was important to both Catholic Charities and the prospective adoptive parents. Catholic Charities' policy is to make full disclosure to the prospective parents of the health and medical condition of the child they are adopting. For example, whether the child had been subjected to PKU testing was likewise important in order to make certain diet modifications for the child to prevent serious permanent damage.
In any event, Hambrick was surprised that there were so many incomplete blanks on Geoffrey's form because they were usually completely filled out. This led Hambrick to believe that the form was evidence of poor record keeping. Hambrick also conceded that Catholic Charities could have contacted the hospital or treating physicians and obtained the necessary information to complete the form. This is what they do now.
On the other hand, Hambrick explained that Catholic Charities has never had a doctor on its staff or anyone who is trained to evaluate medical records. Catholic Charities never instructed the doctors as to what tests and treatments should be given *972 to each child. Moreover, the doctor, who is chosen by the adopting parents, provides the court at the adoption proceedings any medical information about a child's health. Even today, Catholic Charities simply gives a medical form to the parents, who, in turn, are to give it to their pediatrician to be completed. No one at Catholic Charities either fills out the form or evaluates any medical information about a child and gives that information to the court.
The foregoing is the evidence that the trial court had before it during the hearing on Catholic Charities' summary judgment motion. After the hearing on the summary judgment motion, Foster obtained an affidavit from Elizabeth Cole which was presented with his motion to vacate. In this motion Foster explained:
Ms. Cole is extremely well versed and knowledgeable as to the creation, implementation and promulgation of adoption agency standards and standards of care as they exist throughout the United States. In her affidavit, Ms. Cole states that a "standard of care" does exist for fee paid private adoption agencies such as Catholic Charities. She further states in her affidavit that the standard of care was breached by Catholic Charities in this case and that in her opinion said breach was a proximate cause of the injuries sustained by Geoffrey Dufton Foster... .
As stated previously, the trial court sustained its order. Now we address Foster's assignments.

PROPOSITION I

CATHOLIC CHARITIES OWED A DUTY TO EXERCISE REASONABLE CARE IN INVESTIGATING THE HEALTH OF GEOFFREY FOSTER AND IN ADVISING HIS PROSPECTIVE ADOPTIVE PARENTS OF ANY HEALTH PROBLEMS.
Since Foster raises a claim of negligence, it is obvious that he must prove by a preponderance of the evidence: duty, breach of duty, proximate cause and damages. Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1354 (Miss. 1990); Phillips v. Hull, 516 So.2d 488, 491-92 (Miss. 1987); see also, Beck v. Thompson, 818 F.2d 1204 (5th Cir.1987).[6] Recovery must be denied where a plaintiff fails to prove any one of these elements. Only when the first two items are shown is it possible to proceed to a consideration of proximate cause since a duty and breach of that duty are essential to a finding of negligence under the traditional and accepted formula. Ward, supra.
One major contention between the parties is whether Catholic Charities breached that duty. In particular, Foster argues that a duty in fact existed because under "the common law of Mississippi a person or entity which undertakes to perform an act must exercise reasonable care in performing that act."
What is duty?
[I]n order to recover for an injury to a person or property, by reason of negligence or want of due care, there must be shown to exist some obligation or duty toward the plaintiff which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests.
Gulf M & N Railroad Co. v. Sparkman, 180 Miss. 456, 466, 177 So. 760, 762 (1938).
Stated another way, this Court also has explained that "negligence is the result of the failure to perform a duty; therefore, actionable negligence cannot exist in the absence of a legal duty to an injured plaintiff." Stanley v. Morgan & Lindsey, Inc., 203 So.2d 473, 475 (Miss. 1967). Accord, Robinson v. Estate of Williams, 721 F. Supp. 806 (S.D.Miss. 1989). The existence vel non of a duty of care is a question of law to be decided by the Court. Ward, 450 *973 F.2d at 1181 n. 15; Morgan & Lindsey at 473; Faulkner Concrete Pipe Co. v. Fox, 248 Miss. 50, 157 So.2d 804 (1963); see also, W. Keeton, Prosser and Keeton on Torts, 236 (5th Ed. 1984) (the existence of a duty is entirely a question of law and it must be determined only by the court. A decision by the court that there is no duty must necessarily result in judgment for the defendant.).[7]
Foster relies on three cases to establish that Catholic Charities, in fact, violated its duty to them. In his first case, Chadwick v. Bush, 174 Miss. 75, 163 So. 823 (1935), Foster relies on the following language:
Long before there were any statutes in this state, it was the established law of the land, applicable to every member of the civil community, that each shall so use his own or otherwise so guide his conduct as not unreasonably to injure another; and that an actionable wrong has been committed when a responsible person has neglected to use a reasonable degree of care and diligence for the protection of another person from such injury as under the existing circumstances should reasonably have been foreseen as a natural and proximate consequence of that negligence. It requires no statute to give force and validity to the principles of the law of negligence  no more than as to any other portion of the great field of the common law ...
Id. at 80-1, 163 So. at 824.
In that case, however, the facts indicate that the decedent was killed in an automobile accident on a public highway when his car collided with the defendant's truck. Id. 163 So. at 823-24. The major issues before the jury concerned two things: whether it was reasonable for the defendant to drive, after midnight, a seven foot four-inch wide truck without a light on the left side; and did defendant's failure to have a left light contribute to and proximately cause the accident. Id. at 824.
On appeal the issues before this Court, however, concerned whether the trial court should have submitted jury instructions requested by the defendants. One jury instruction informed the jury that Mississippi had no statutes requiring defendants to keep a light or sign on the left side of their vehicles. The second instruction indicated that the width of defendant's truck was not in violation of any Mississippi statute. It is in this context that this Court made the above statement and concluded that it was "reversible error to grant [the instructions] ... since we cannot say with dependable confidence that the jury was not misled thereby into supposing that since no statute had been enacted validating the instruction, the law [announced in the first instruction] was not fully obligatory upon them." Id. at 81, 163 So. at 824.
Without doubt, the defendants had a duty to use the public roads in a reasonably safe manner.
The second case that Foster cites for approval is Brunt v. Chicago Mill & Lumber Co., 243 Miss. 607, 139 So.2d 380 (1962). That case involved a suit for property damages caused by the negligent operation of an airplane. Id. 139 So.2d at 381. The simple question before the jury was whether a pilot could be held liable for a cattle stampede when, as he ascended for landing, he flew "over and near the cattle with the motor [at full throttle]." In reversing the lower court, this Court made the following statement:
The probability of injury by one to the legally protected interests of another is the basis for the law's creation of a duty to avoid such injury. Every person is under duty to exercise his senses and intelligence in his actions in order to avoid injury to others, and where a situation suggests investigation and inspection in order that its dangers may fully appear, the duty to make such investigation *974 and inspection is imposed by law. It is no excuse that one who has created a peril did not intend or expect any injury to result therefrom; every person is held to a knowledge of the natural and probable consequences of his acts.
243 Miss. at 615, 139 So.2d at 384 (emphasis added).
What Foster fails to point out is that on appeal the plaintiff/appellant emphasized the following points: that the pilot was licensed and experienced; that he knew the rules of aviation; that he should have known at least a hundred cattle were grazing in the pasture; therefore he should have known and reasonably foreseen, if he exercised ordinary care, that taking off at full throttle would cause the cattle to stampede. Id. 139 So.2d at 383-84. Surely, Foster cannot say that Catholic Charities created his peril.
Finally, Foster points to Dr. Pepper Bottling Co. v. Bruner, 245 Miss. 276, 148 So.2d 199 (1962). The facts of that case are pretty simple. After delivering drinks to a local drug store, one of Dr. Pepper's employees pushed a cart loaded with drinks into the plaintiff's leg. Id. 148 So.2d at 200. On appeal Dr. Pepper insisted that it was entitled to a peremptory instruction. As Foster points out in his brief, however, this Court affirmed the lower court and gave this discussion of duty:
As a general rule, it is the natural inherent duty owed by one person to his fellowmen, in his intercourse with them, to protect life and limb against peril, when it is in his power to reasonably do so. The law imposes upon every person who undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons, or the property of other persons  the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or property which is directly attributable to a breach of such duty ... Stated broadly, one who undertakes to do an act or discharge a duty by which conduct of others may be properly regulated and governed is under a duty to shape his conduct in such manner that those rightfully led to act on the faith of his performance shall not suffer loss or injury through his negligence.
245 Miss. at 282, 148 So.2d at 201 (emphasis added).
Catholic Charities, on the other hand, relies on other cases. For example, it cites Illinois Central RR Co. v. Bloodworth, 166 Miss. 602, 145 So. 333 (1933). In that case, the decedent was killed while walking across an elevated railroad bridge. The driver of the car was involved in a race when
it struck an iron water main with such force that the main burst, and also the tire of the car; the car plunged from the south side of the bridge to the north side, back across the driveway and the south walk to the guard rail, loosening some of the upright pieces thereof, and hurled [the decedent] who was in its path, to the ground below.
Id. 145 So. at 334.
The plaintiffs sued alleging, inter alia, that the bridge was negligently constructed and maintained. This Court responded:
Precaution is a duty only so far as there is reason for apprehension. Ordinary care of a reasonably prudent man does not demand that a person should prevision or anticipate an unusual, improbable, or extraordinary occurrence, though such happening is within the range of possibilities. Care or foresight as to the probable effect of an act is not to be weighed on jewelers' scales, nor calculated by the expert mind of the philosopher, from cause to effect, in all situations. Probability arises in the law of negligence when viewed from the standpoint of the judgment of a reasonably prudent man, as a reasonable thing to be expected. Remote possibilities do not constitute negligence from the judicial standpoint.
Id. 145 So. at 336; see also, Capitol Tobacco & Specialty Co. v. Runnels, 221 So.2d 703, 705 (Miss. 1969); Burnside v. Gulf Refining Co., 166 Miss. 460, 470, 148 So. 219, 221 (quoting Bloodworth, supra).
*975 This same point is expressed in Jarbon v. State, 172 Miss. 135, 139-40, 159 So. 406, 407 (1937), where this Court stated the following:
[I]t is elemental that, in order that a wrongdoer may be held liable ... for negligence, it is necessary to show that the injury complained of was the natural and probable result of the negligence ... `Actionable fault on the part of a defendant must be predicated on action or nonaction accompanied by knowledge actual or implied of the facts which make the result of his conduct not only a probable result but a result also which he should, in view of these facts, have reasonably anticipated.' That a particular result was possible result does not establish a case... .
(citations omitted).
The Fifth Circuit has provided this discussion of negligence law in Mississippi:
For actionable negligence to exist, the defendant must owe the plaintiff a legal duty. We noted Mississippi's adoption of this universal principle in Ward v. Hobart Mfg. Co.

A duty does not exist, `[i]f the defendant could not reasonably foresee any injury as the result of his acts, or if his conduct was reasonable in the light of what he could anticipate' ... The rationale behind this foreseeability requirement is that no one is expected to guard against events which are not reasonably to be anticipated or that are so unlikely that the risks would be commonly disregarded.
Karpovs v. State, 663 F.2d 640, 649 (5th Cir.1981) (citations omitted).

Was this result foreseeable?
The parties agree that some type of foreseeability analysis must be used. They, however, reach different conclusions.
In a negligence case, "the standard for determining whether the actor should have foreseen the probability of harm from his conduct is an external one, from the point of view of the actor
262 (S.D.Miss. 1967), aff'd 394 F.2d 482 (5th Cir.1968) (quoting Sturdivant v. Crosby Lumber & Mfg. Co., 218 Miss. 91, 65 So.2d 291 (Miss. 1953)).[8] With this in mind, Catholic Charities points to the evidence which shows that PKU is a rare disease[9] occurring once in every 10-12,000 Caucasian deliveries. Catholic Charities was unaware of any positive PKU test upon any children it had placed in the past. Dr. Seashore[10] estimated that only three or four children are born each year with PKU in Connecticut where she practices.
In addition to the rarity of the disease, the fact that it is inherited through recessive genes, and it does not manifest itself in the natural parents (i.e., no symptoms or indications of disease) decreases what little foreseeability there may be. Moreover, even when the child is born there are still no physical indications of the disease. The developmental delays are four to six months after birth. Prior to that time, however, the children appear perfectly normal.
The uncontradicted evidence established that Catholic Charities had no reason to know Geoffrey had PKU or any knowledge[11] or experience giving it cause to *976 inquire about a test for the disease. They could not give any type of medical examination because there were no doctors on its staff. This does not mean, however, that Geoffrey received no medical attention. He was born at the University Hospital. Dr. Bass was his attending physician, and the members of the medical team assisted him. Geoffrey remained at the hospital for six days, and the Fosters picked him up from there.[12]
When the Fosters received custody of Geoffrey, it was their responsibility to take him to a pediatrician. Catholic Charities' adoption procedures required this. In addition, the Fosters were required to provide suitable care and other necessities for Geoffrey during the time prior to Geoffrey's legal adoption, and they agreed to assume all costs for medicine and medical treatment. Finally, on this point, it cannot be overemphasized, as a part of the adoption procedures, Catholic Charities required the Fosters to obtain certification from their own pediatrician that Geoffrey was in good health.

Was Catholic Charities Wrong for Relying on the Physicians?
In 1972, when Geoffrey was born, it was not mandatory to give PKU tests to newborn children. That, however, changed with the enactment of MISS. CODE ANN. § 41-21-203, and its subsequent amendment in 1985.[13] Even in these statutes, it appears that the legislature believes that the physicians are in the best position to conduct the test. Moreover, the standards for adoption agencies require them to rely upon the professional expertise of the physicians, who care for the child, in making a medical evaluation. The standards provide

Section 6.21: Use of Other Professional Services.

The responsibility of consultants is to provide the service, information, advice and recommendations that are related to their specialized fields and professional competence. The consultants' essential role is to contribute on the basis of their specialized knowledge, to all the findings that must be considered in reaching final decisions.

Section 6.22: Responsibilities of the Physician.

The physician in an adoption service is responsible for:
medical evaluation of the child and consultation as needed;
evaluation of the physical condition and development of the child, of the child's family and placement history, of significant factors in prenatal and birth and medical history, and of the medical history of natural parents;
interpretation to agency staff, and to adoptive parents and their physician for the child, of specific medical treatment that the child may require.
Child Welfare League of America, Inc., Standards for Adoption Service, §§ 6.21 and 6.22 (1978).
Catholic Charities gave the information it had concerning Geoffrey. This information came both in writing and verbally. No information about a PKU test was discussed or disseminated because Catholic Charities had no information about PKU testing. Neither the parents' conditions nor the child's condition at birth could provide any reason for the Fosters to inquire about a PKU test. Catholic Charities, however, concedes that had someone at UMC informed it that no PKU test was done or *977 that Geoffrey's adopting parents should be notified that no test was done, then it may have had a duty to convey that information to the Fosters.

Were The Physicians In A Better Position To Determine Whether A PKU Test Was Done?
Aside from the facts that PKU is a rare disease; that § 41-21-203 implies that the physicians should perform the PKU test; and that Geoffrey remained in the care of the hospital and its staff for six days, other facts still must be highlighted. Of some significance, for example, is the fact that Dr. Nichols, the Fosters' personal pediatrician, understood the importance of PKU tests. He, in fact, was part of the team that implemented a routine infant screening at the Baptist Medical Center in 1965. While serving on the staff of University Medical Center as attending physician in the Pediatrics Department and as a visiting staff teacher, Nichols knew that this hospital did not screen for PKU at the time of Geoffrey's birth. His commitment to PKU screening was so great that he lobbied the Mississippi Legislature to have it required by law.
With Nichols' knowledge of and involvement with PKU screening, it seems that Catholic Charities could be assured that someone would conduct the test. This duty of conducting a test or informing a doctor that the test should be given is not in the province of an adoption agency. An agency cannot be cloaked with the same responsibility as a physician. And, there is no way that Catholic Charities reasonably could have foreseen that all of these doctors and medical professionals would overlook this crucial concern and fail to perform a PKU test.

But What Does Foster Say?
Foster insists that Catholic Charities must share the blame. One of his major points is the fact that Catholic Charities gave his parents a brochure entitled "What is Adoption?," and in this brochure "Catholic Charities represented to [them] that it `assume[d] a sacred trust to the mother, to the child, and also to the adoptive parents.'" Continuing, Foster alleges that "Catholic Charities further represented to [his parents] that "... `the agency [would] conduct a painstakingly thorough and a time consuming investigative procedure ... [into] ... the child's physical and mental health potential ...'" Id.
In addressing Foster's assertion, we note that the first statement does not require Catholic Charities to discover hidden conditions or ailments in the child. This statement only emphasizes its commitment to carry out its purpose, which is "to find the best homes and parents for the children." Furthermore, when this statement is read in context with the other words in the paragraph, one easily can decipher what Catholic Charities, an agency affiliated with the Catholic Church, means when it says "sacred trust."[14]
Foster's deletions, in the second statement upon which he relies, are far more egregious.[15] Unquestionably, Catholic Charities conducted a time-consuming investigation. Catholic Charities required the Fosters to complete applications. The information solicited included, inter alia, the parents' religious affiliation, occupation, occupational history, educational history, family history, the types of newspapers and periodicals to which the family subscribed, and references. Catholic Charities conducted an adoptive homestudy, which included some of the same, but far *978 more detailed, information as the applications. It also included descriptions of the Fosters' home and neighborhood and the impressions of the social worker conducting the study. Interviews were conducted with the couple, together and separately, their references, and detailed records were kept concerning all of these matters.[16] Therefore, to say that Catholic Charities failed to conduct a painstakingly thorough investigation is not premised on the facts of this case.
Contrary to what Foster asserts, the creation of the medical information form does not obligate Catholic Charities to make sure it is completed and that all things on the form are examined. This simply was used as a tool to assist the parents and their personal pediatricians. It should be pointed out that on the form the term "PKU" does not have the only empty blank beside it. For instance, the space next to respiration is also blank. Would it be Catholic Charities' responsibility to determine if a child is breathing properly? According to the appellants, one would have to take that position.
Foster likewise is reading too much into the form by insisting that Catholic Charities "saw the importance of PKU testing and foresaw the harm from a failure to test for PKU by including `PKU' on its ... form with a space for test results." Even if it thought it was important, Catholic Charities still could not perform the test. Moreover, the form also has an empty blank next to circumcision.[17] If we were to discover that being "uncircumcised" causes some type of problem, would an adoption agency be required to perform a circumcision or notify the doctor, even though the doctor conducts his own examination?[18] According to Foster's argument, this would be the case.
Finally, Foster also says "[he] has never sought to minimize Dr. Nichols' responsibility for his medical evaluation and care of [him]." But, according to Geoffrey, Nichols had to rely heavily upon the medical information form because he could not obtain his records because the doctor did not know his name or the name of his natural parents.
This assertion can be brushed aside for at least two reasons. The foremost reason is that Nichols saw the form, and he examined the child. He saw the blank. No matter what he thought, it was his duty to examine Geoffrey completely before qualifying him to be in good health. Secondly, although he did not know Geoffrey's birth name, he knew his adopting parents. For any information he needed, particularly this type of information, he could have contacted them. Additionally, whether he knew the treating physician is no real reason to shy away from his duty to perform the PKU test.[19]
Foster is correct when he states that "[i]t may be argued that the hospital physician was negligent in not ordering the PKU Test and that Dr. Nichols was negligent in not further investigating the blank beside "PKU". He, however, should end there; instead he insists that Catholic Charities should be cloaked with the same kind of duty.

This Cannot Be The Case!
We repeat, Catholic Charities had no doctors on its staff. And, it is the physician who is in the best position to detect or give a test for PKU. Only where there is no attending physician does the responsibility *979 necessarily shift to the person attending a new born. See MISS. CODE ANN. § 41-21-203.
This is a case of first impression for this Court, and we have been able to find only a limited number of analogous cases from other jurisdictions, which discuss the duty of care imposed upon adoption agencies in placing children. In Richard P. v. Vista Del Mar Child Care Service, 106 Cal. App.3d 860, 165 Cal. Rptr. 370 (1980), the thrust of the plaintiff's complaint was that an adoption agency may be held liable in tort on a theory of intentional or negligent misrepresentation in failing to warn the adopting parents that the infant's premature birth may lead to physical or mental health problems. Id. at 863, 165 Cal. Rptr. at 371.
The facts indicate that the adoption agency informed the parents that the infant was premature, had large earlobes but was healthy. Id. at 864, 165 Cal. Rptr. at 371. A day after he was placed in their home, the parents took the child to a pediatrician who declared him healthy. Id., 165 Cal. Rptr. at 372. Eight months later the adoption was finalized and the child was still in good health. Three years later the parents discovered that their child was suffering from emotional problems. Three years after that the same pediatrician informed them that their son's problems were predictable at birth. Id. The parents then sued the agency.
The court framed two of the issues as follows: Does the law recognize a cause of action in tort against an adoption agency for an unintentional but negligent misrepresentation in the placement of a child? And, if present law does not recognize such a cause of action, should it? 165 Cal. Rptr. at 372. While concluding that no cause of action should be recognized for negligence, the court carefully explained that:
[d]ecisions as to whether to tighten or enlarge the circle of rights and remedies are often phrased in terms of a duty of care. The real basis of negligence is not carelessness, but behavior which society in general views as involving unreasonable risk of harm to others.
The policy factors which must be considered in determining whether a duty exists have been judicially defined as follows: the foreseeability of harm, the degree of certainty of injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.
As to the foreseeability of harm factor, it does not follow that a premature baby will necessarily at some future date suffer severe emotional or developmental problems ... [N]o moral blame can be attributed to an adoption agency which makes a full disclosure of the child's medical history to the prospective adoptive parents. Moreover, it is doubtful that the proposed liability would reduce future harm. If anything, it would be more likely to impede the proper functioning of adoption agencies.
In short, to impose liability in a case such as this would in effect make the adoption agency a guarantor of the infant's future good health. That, of course, would be entirely unreasonable. After all, such a guarantee is unavailable to natural parents who, when fortunate enough to bring into the world a healthy child, have no guarantee whatsoever the child will continue to enjoy good physical and emotional health.
Id. at 373-74 (citations omitted) (emphasis added).
This position was followed in Michael J. v. County of Los Angeles, Department of Adoptions, 201 Cal. App.3d 859, 247 Cal. Rptr. 504 (Cal. App. 2 Dist. 1988). The facts in that case establish that the child's natural mother voluntarily relinquished him to the county for adoption. Id. 247 Cal. Rptr. at 505. Since birth the child had a port wine stain on his upper torso and face, a manifestation of Sturge-Weber Syndrome. *980 This condition is congenital and present at birth and can be detected during a medical examination shortly after birth. Id. at 506.[20] Although the adopting mother made an inquiry concerning the "birthmark", the agency concealed the nexus between the stain and the syndrome, Id. Some ten years after he was adopted, Michael had an epileptic seizure. That is when his mother discovered that he had Sturge-Weber Syndrome.
In reaching its conclusion, the court first reiterated the facts and policy implications of Richard P., supra, but concluded that this case was different because "the evidence raised a triable issue of fact regarding the failure to disclose a material fact within the agency's possession that the examining physician would not render a prognosis for Michael." Id. 247 Cal. Rptr. at 513. The court summed up the point this way:
By recognizing an action for intentional misrepresentation or fraudulent concealment, we are not imposing on the agency a duty to predict the future health of a prospective adoptee. However, there must be a good faith full disclosure of material facts concerning existing or past conditions of the child's health. ... Public policy cannot extend to condone concealment or intentional misrepresentation which misleads prospective adoptive parents about the unusual calamity they are assuming....
Id. at 513 (emphasis added).
This view is similar to one expressed in Burr v. Board of County Commissioners of Stark County, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). In this case, the only evidence relayed by a caseworker to the adopting parents was that the infant's natural mother was eighteen years old and living with her parent. Basically, he was a "... nice, big, healthy baby boy." Id. 491 N.E.2d at 1103. During the ensuing years Patrick suffered from several physical and mental maladies. When he was in primary school, he was classified as educable, mentally retarded. Id. After entering high school, he was diagnosed as suffering from Huntington's Disease, a genetically inherited disease which destroys the central nervous system. Id.
The parents later were allowed to see the adoption records concerning Patrick's background. Id. at 1103. They discovered that his natural mother was not an eighteen-year-old girl but a thirty-one year old mental patient in a state hospital. Id. His father also was presumed to be a mental patient. The other information that the caseworker gave them was a lie as well. They commenced a wrongful adoption action grounded in fraud. At trial they testified that they never would have adopted Patrick had they been told the truth. Id.
In affirming the finding that the caseworker's representations were material to the adoption and were made with the intention of misleading the Burrs, the court made the following comments:
If the true facts regarding this child's background and condition at the time of adoption did not present a foreseeable risk of disease of the mind and body, appellants would not have had to engage in their complex scheme of deception ...
* * * * * *
... In no way do we imply that adoption agencies are guarantors of their placements. Such a view would be tantamount to imposing an untenable contract of insurance that each child adopted would mature to be healthy and happy. Such matters are solely in the hands of a higher authority. Adoptive parents are in the same position as, and confront risks comparable to those, of natural parents relative to their child's future ... [J]ust as couples must weigh the risks of becoming natural parents, taking into consideration a host of factors, so too should adoptive parents be allowed to make their decision in an intelligent manner. It is not the mere failure to disclose the risks inherent in this child's background which we hold to be actionable. Rather, it is the deliberated act of misinforming this couple which deprived them *981 of their right to make a sound parenting decision and which led to the compensable injuries... .
Id. at 1107, 1109 (emphasis added).
One final case that merits discussion also involved a wrongful adoption of a child suffering from Huntington's Disease. In Meracle v. Children's Service Society of Wisconsin, 149 Wis.2d 19, 437 N.W.2d 532 (1989), the Meracles contacted CSS and informed them that they wanted to adopt a "normal healthy child," with average or above average intelligence. Id. 437 N.W.2d at 533. Two years later they met with a CSS social worker to discuss adopting Erin. Id. The social worker told the Meracles that Erin's paternal grandmother had died of Huntington's Disease; that the disease is genetically transmitted between generations; that if one generation was free of the disease, the next generation would be free of it. They were also told that Erin had tested negative for the disease; therefore, she had no more chance to develop it than any other child. Id. The adoption was completed the following year.
Approximately three years later, Erin was diagnosed with the disease. Id. Her parents subsequently filed suit alleging negligent placing and negligent misrepresentation. In discussing these issues, after explicitly stating that it was not addressing the question of whether adoption agencies have a duty to discover and disclose health information about children they place for adoption, the court said:
... we hold that the Meracles' claim is not barred by public policy. Such a conclusion does not expose adoption agencies to potentially unlimited liability nor does it make such agencies guarantors of the health of adopted children. To avoid liability, agencies simply must refrain from making affirmative misrepresentations about a child's health. We do not hold that agencies have any duty to disclose health information. Indeed, it will give potential parents more confidence in the adoption process and in the accuracy of the information they receive. Such confidence would be eroded if we were to immunize agencies from liability for false statements made during the adoption process.
Id. at 537 (emphasis added).

Summation on This Point
We have explained these cases in detail to demonstrate the necessity to approach slowly any attempt to make an adoption agency liable for the health of the children that they place. This is particularly so when an adoption agency has done all that it could do before placing the child. Catholic Charities informed the Fosters of all the information it had. It conducted a painstakingly and thorough study. It was involved in no misrepresentation or fraud. The Fosters, however, do not even argue that Catholic Charities was involved in fraud or misrepresentation. They insist that Catholic Charities was simply negligent in not informing the doctors that Geoffrey had not been tested for PKU; therefore, it is liable.
There, however, are several things which favor Catholic Charities. These include, inter alia, (1) the rarity of this disease; (2) the inability to detect the disease at any time before birth; (3) there were and are no doctors on Catholic Charities' staff; (4) Geoffrey remained in the hospital six days after his birth and no doctor, nurse or other medical professional thought to give a PKU test; (5) the Foster's own pediatrician did not give the test; and (6) no one informed Catholic Charities that a test had not been conducted. These points simply are reiterated to demonstrate that the duty to determine whether Geoffrey had PKU was left in the hands of the doctors (including Geoffrey's personal physician), and the medical staff at the University Hospital. Moreover, as a matter of law Catholic Charities reasonably could not have foreseen the injury or anticipate that the medical professionals would be negligent in performing their duties.
Now, we briefly discuss the two remaining issues as denoted by Foster.

*982 PROPOSITION II

CATHOLIC CHARITIES' VIOLATION OF ITS DUTY TO THE FOSTERS WAS A PROXIMATE CAUSE OF THE INJURIES TO GEOFFREY
This assignment has been discussed in the preceding discussion as to who had the duty to conduct the PKU test. This aside, however, the Fosters insist Catholic Charities' failure to properly complete the Child's Medical Information form and/or thoroughly investigate Geoffrey's health combined with the doctors' negligence proximately caused his damages.
As stated in Simmons v. Amerada Hess Corp., 619 F.2d 440 (5th Cir.1980), Mississippi negligence law provides:
An act which merely furnishes the condition or occasion upon which injuries are received, but which does not put in motion the agency by or through which the injuries are inflicted, does not constitute the proximate cause of the harm. Mississippi City Lines, Inc., v. Bullock, 194 Miss. 630, 13 So.2d 34, 36 (1943).
Id. at 441.
In a recent opinion, this Court provided this explanation of the rule of intervening cause:
Although one may be negligent, yet if another, acting independently and voluntarily, put in motion another and intervening cause which efficiently thence leads unbroken in sequence to the injury, the later is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a non-actionable cause. Negligence, which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof.
13 So.2d at 36.
Glorioso v. YMCA of Jackson, 556 So.2d 293, 296 (Miss. 1989) (quoting Mississippi City Lines, supra).
Even if Catholic Charities were negligent in completing the form, it does not necessarily follow that its negligence resulted in Geoffrey's injuries. If this were the case, then Catholic Charities would have to be liable for the other blank spaces on the Medical Information Form. It was not Catholic Charities' duty to conduct any test; it did not have the capacity to do so. It is unreasonable that Catholic Charities could foresee that the entire medical staff in the Pediatrics Department would over-look such an important test during Geoffrey's six-day stay at the hospital. Moreover, it is even less likely that Dr. Nichols also would allow this empty blank to go unnoticed and uninvestigated. Consequently, it is clear that the hospital's medical staff and treating physicians' negligence superceded anything that Catholic Charities did or failed to do.
Therefore, we turn to Foster's final assignment.

PROPOSITION III

CATHOLIC CHARITIES SHOULD NOT HAVE BEEN GRANTED A SUMMARY JUDGMENT
This court recently has explained summary judgment with this language:
In determining whether the trial court was proper in granting [a] Motion for Summary Judgment, we must conduct de novo review.
The law governing the grant or denial of a motion for summary judgment is well established, [as the Court] has explained repeatedly:
The trial court must review carefully all of the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied.
Issues of facts sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the *983 matter in issue and another says the opposite.

Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984). See also, Allison [v. State Farm Fire & Casualty Co.] 543 So.2d [661] at 663 [(Miss. 1989)]; [Clark v.] Moore Memorial, 538 So.2d [760] at 762 [(Miss. 1989)]; Short v. Columbus Rubber & Gasket Co., 535 So.2d 61, 63 (Miss. 1988); and Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983).
The movant is strapped with the burden of demonstrating that no genuine issue of fact exists while the non-movant is given the benefit of every reasonable doubt. By the same token, however, the non-movant cannot just sit back and remain silent, but he must rebut by producing significant probative evidence showing that there are indeed genuine issues for trial. The non-movant, in generating an issue of fact sufficient to avoid an adverse rendering of summary judgment, cannot rely soley [sic] on his pleadings, which simply allege or deny a material fact. But, he must present `by affidavit or other wise set forth specific facts showing that there are indeed genuine issues for trial.' Stated another way, the non-movant must bring forward `significant probative evidence demonstrating the existence of a triable issue of fact.'
Newell v. Hinton, 556 So.2d 1037, 1041 (Miss. 1990) (citations omitted); McMichael v. Nu-Way Steel and Supply, Inc., 563 So.2d 1371, 1374-75 (Miss. 1990). An elaborate discussion of this procedure is found in Palmer, 564 So.2d at 1356-57.
Catholic Charities insists the "plaintiff failed to make a showing of proof that Geoffry's PKU, and the doctors' failure to diagnose it, should have been anticipated by [it]." Moreover, Catholic Charities contends that there was no proof of foreseeability. As a consequence, Foster could not "prove the essential elements of duty, breach of duty, or proximate cause." Id.
Foster principally relies on the affidavit of Elizabeth Cole to demonstrate that there is a genuine issue of material fact. The trial court, on the other hand, found that there was no duty especially in light of the foreseeability analysis provided above. The Fosters have provided no evidence that would have given Catholic Charities reason to anticipate that Geoffrey had PKU or that any test should have been conducted or had not been and would not be conducted by Geoffrey's physicians. It is undisputed that Catholic Charities had no information about PKU testing to convey to anyone. The information they did have they passed along to the physicians and the Fosters. There also is no evidence which supports a finding of foreseeability of harm to Geoffrey as a consequence of a blank on Catholic Charities' medical information form, such that the form would be deemed the proximate cause of his damages. These are material facts that were on the table, and they remained uncontradicted; therefore, summary judgment was appropriate as a matter of law. Palmer, 564 So.2d at 1355.

CONCLUSION
"This is a very unfortunate and very sad and tragic incident, and the sympathy of everybody goes out to this little family which has [had to deal with this]. But sympathy is not a motivating influence or a proper ingredient of a decision in any case." Smith v. United States, 284 F. Supp. 259, 262 (S.D.Miss. 1967). These words are quite appropriate in this case. Imposing a duty upon Catholic Charities in this case based on these facts would not be the appropriate decision to make.[21] There is no evidence of misrepresentation or fraud. Neither, is there evidence that Catholic Charities did not do all that it could. It disclosed what information it *984 had.[22] As to the Medical Information Form, it did not abrogate the physicians' and hospital's duty of care toward Geoffrey. It simply provided spaces for the doctors to insert the results of their examination.
We, therefore, affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., and HAWKINS, P.J., and PRATHER, ROBERTSON and BLASS, JJ., concur.
SULLIVAN, J., dissents by separate written opinion joined by PITTMAN, J.
DAN M. LEE, P.J., concurs in result only.

*985 APPENDIX

*986 SULLIVAN, Justice, dissenting:
The majority reviewing the evidence de novo decides that the trial court properly granted Catholic Charities' motion for summary judgment because there were no genuine issues of material fact. The majority never precisely states whether there was no genuine issue of material fact that Catholic Charities owed the Fosters a duty or whether Catholic Charities breached a duty owed, but the majority does find that even were Catholic Charities negligent, that violation was not the proximate cause of the injuries to Geoffrey.
In the majority's "Summation on This Point" the majority appears to conclude that there was no breach of duty because Catholic Charities had done all it could do, it informed the Fosters of all the information it had, it conducted a painstaking and thorough study, and it did not engage in misrepresentation or fraud. In the next paragraph the majority seemingly concludes there was no duty owed because the physicians were better able to determine whether Geoffrey had PKU and that Catholic Charities could not reasonably have foreseen the injury or anticipate that the physicians would be negligent in performing their duties. In the majority's second proposition, the majority states that Catholic Charities had no duty to conduct any tests on Geoffrey and that the hospital's medical staff and treating physicians' negligence superceded any negligence which may have occurred. In reviewing the evidence in the light most favorable to the Fosters, I disagree that Catholic Charities met its burden of showing that there was no genuine issue of material fact that it had a duty, that it breached its duty, or that its acts were the proximate cause of Geoffrey's injuries.
An adoption agency is not a guarantor of an adopted child's health, nor is the agency generally required to discover latent medical conditions. See Michael J. By and Through Trout v. Los Angeles County, Dept. of Adoptions, 201 Cal. App.3d 859, 247 Cal. Rptr. 504, 513 (1988). An exception to this occurs, however, where the adoption agency takes on that duty, which is exactly what Catholic Charities did. See Petrowsky v. Family Serv. of Decatur, Inc., 165 Ill. App.3d 32, 116 Ill.Dec. 42, 518 N.E.2d 664 (1987) (court did not recognize tort of malpractice of an adoption, but did allow action for breach of adoption agreement). Catholic Charities stood up and said to the world that it would thoroughly investigate the health and medical condition of the children adopted through it and that testing for phenylketonuria (PKU) was part of that investigation. Catholic Charities determined its own duty by its policies and the representations it made to prospective parents, and that is the duty by which it should be judged today. Anything less is a travesty of justice.
I find that the evidence unequivocally proved that Catholic Charities owed the Fosters a duty to conduct a "painstakingly thorough and a time consuming investigative procedure" into Geoffrey's physical and mental health as this guarantee was set forth in Catholic Charities' brochure titled "What is Adoption?". Because Catholic Charities developed the "Child Medical Information Form" which included a blank for PKU testing, because it was Catholic Charities' policy to have its agency workers complete the medical form by contacting the examining physician or the hospital to obtain the information, because the director of the adoption and medical program stated in her deposition that it was important to both Catholic Charities and the prospective parents to know whether a child to be adopted had PKU and that it was Catholic Charities' policy to get as much and as accurate information as it could on the "Child Medical Information Form", and because this director also stated that in this case the Medical Information Form was incomplete, I would find that there exists sufficient evidence to create a genuine issue of material fact whether Catholic Charities breached the duty it undertook to perform and whether this breach was a proximate cause of the alleged damages.
There is no doubt that this case involves a series of failures to act. The physician attending Geoffrey at birth failed to test him for PKU, Catholic Charities failed to ask whether the test had been done when *987 recording Geoffrey's medical information on Catholic Charities' "Child Medical Information Form" which had a space for the PKU test, and Dr. Nichols, who assessed Geoffrey during the adoption, failed to realize the test had not been done during Geoffrey's newborn hospitalization. However, Catholic Charities was the only party which could obtain the health and medical information on Geoffrey from his hospital stay immediately after birth, and Catholic Charities took on the responsibility of ensuring that a thorough medical check-up was done. Catholic Charities was the liaison, and the Fosters relied on Catholic Charities to provide them relevant information from its "painstakingly and thorough" investigation. Because the investigation was incomplete Catholic Charities failed to note that the PKU test was not performed. Because of Catholic Charities' failure to record that the test had not been done, Dr. Nichols believed it had been done and the space was blank because the results had not been returned from the testing laboratory. Geoffrey is now mentally retarded due to this series of events. I find that the trial court's granting of summary judgment to Catholic Charities was improper, and I would grant the Fosters a trial on the merits and allow a jury to decide whether Catholic Charities breached its duty to the Fosters and whether its negligence proximately caused Geoffrey's injuries.

I. Duty
The first issue addressed by the majority is whether Catholic Charities owed the Fosters a duty. After a lengthy analysis the majority appears to conclude that Catholic Charities owed the Fosters no duty to test Geoffrey for PKU because Catholic Charities could not have foreseen the injury or anticipate that the medical professionals would be negligent in performing their duties and that the duty, if any, was owed by the physician who assessed Geoffrey as a newborn, the medical staff at the University Hospital, and the Foster's physician who assessed Geoffrey during the adoption proceedings. The majority errs in its analysis of the duty owed. The issue is not whether Catholic Charities had a duty to test Geoffrey for PKU and to notify the Fosters of the result. The issue is whether the failure of Catholic Charities to record on its Medical Information Form that the PKU test had not been performed violated its duty to conduct a "painstakingly thorough and a time consuming investigative procedure" into Geoffrey's physical and mental health.
The majority's analysis clouds the obvious answer to the issue. Yes, it is true that PKU is a rare disease which cannot be detected before birth; yes, Catholic Charities had (and has) no physicians on staff; yes, the examining physicians, including the Foster's own pediatrician, did not test Geoffrey for PKU; and yes, no one informed Catholic Charities that the PKU test had not been performed on Geoffrey. The majority, however, chooses to ignore a number of other relevant factors:
(1) Catholic Charities represented to prospective parents, including the Fosters, that Catholic Charities would thoroughly investigate the health and medical condition of the children it placed, and would make a full disclosure to the prospective parents;
(2) Catholic Charities developed the "Child Medical Information Form", which included a blank for the PKU test, which it relied on to investigate the health and medical condition of the children it placed;
(3) a Catholic Charities agency worker was responsible for contacting the hospital or physician, who assessed the child under its natural parents' name, to obtain the medical information and to record it on Catholic Charities' "Child Medical Information Form";
(4) Catholic Charities believed that knowledge of whether one of the children placed had PKU was important to it and to the prospective parents; and
(5) neither the adopting parents nor their physician could obtain the medical information from the natural parents or their physician.
The above factors do not suggest that the possibility that a child could have PKU was unforeseeable to Catholic Charities. *988 Moreover, we need not even get to whether the condition was foreseeable because Catholic Charities assumed the duty to determine whether the test for this condition had been performed. Moreover, Catholic Charities was the only party involved which could obtain the information for the Fosters and their physician.
How do we know Catholic Charities assumed the duty? Catholic Charities represented to prospective parents that it would ensure that a thorough medical check-up was performed on the child. Catholic Charities gave prospective parents a brochure which states in pertinent part:
What is adoption?
[I]n accepting the child, the agency assumes a sacred trust to the mother, to the child, and also to the adoptive parents.
To meet this sacred trust, the agency must conduct a painstakingly thorough and a time consuming investigative procedure. The procedure demands a careful study of the child's parents; the child's physical and mental health and potential; the qualifications of adoptive parents and their ability to provide adequate apportunitites [sic] for the child, and the possible adjustment of the child to its new parents.
Experience proves there can be no short cuts in this procedure. The agency must meet its sacred trust, and in so doing it must rely on the expert and professional advice of many people.
To perform the duties set out in the brochure, Catholic Charities developed a "Child Medical Information Form" which included a blank for the PKU test. Agency workers from Catholic Charities would contact the hospital or physician to obtain the necessary information on the form. This information then was provided to the prospective parents to give to their pediatrician.
The director of the adoption and maternity program for Catholic Charities, Dollie Hambrick, testified in her deposition that Catholic Charities undertook the duty set out in the brochure to thoroughly investigate the health and medical condition of the child, and that this was represented to prospective parents. Hambrick stated (1) that Catholic Charities represented to prospective parents that it would undertake the duty set out in the brochure, (2) that part of the adoption services fee is to gather health information about the child and to disseminate it to the prospective parents, (3) that the medical information form is a permanent part of the adoption record and is to be a source material for those who are interested in the health and medical condition of the child, (4) that Catholic Charities thought all the information on the form was important to both it and the prospective parents, (5) that Catholic Charities' policy was to get as much and as accurate information as it could on the medical information form, and (6) that Catholic Charities believed it was important for both the agency and prospective parents to know whether a child had been tested and had PKU.
Likewise, the deposition testimony of Father Elvin Sunds, the director of Catholic Charities, indicates that Catholic Charities accepted the responsibility of investigating the child's health and medical condition. His statements show that adoption agency workers would review a child's medical records when the child was first discharged from the hospital and that the purpose of obtaining this information and putting it on the medical information form is to notify the adopting parents of a child's medical problems so the parents can give the form to their physician and if necessary provide medical care for the child.
The Restatement, (Second) of Torts, Sec. 323 (1965), supports imposing a general duty of care on those who undertake to act:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or

*989 (b) the harm is suffered because of the other's reliance upon the undertaking.
The law in our state also imposes a common law duty to exercise due care on those who undertake to act. See e.g., U.R.S. Co., Inc. v. Gulfport-Biloxi Regional Airport Authority, 544 So.2d 824 (Miss. 1989); Faulkner Concrete Pipe Co. v. Fox, 248 Miss. 50, 56, 157 So.2d 804, 805 (1963); Dr. Pepper Bottling Co. of Miss. v. Bruner, 245 Miss. 276, 282, 148 So.2d 199, 201 (1962).
As a general rule, it is the natural inherent duty owed by one person to his fellowmen, in his intercourse with them, to protect life and limb against peril, when it in his power to reasonably do so. The law imposes upon every person who undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which is directly attributable to a breach of such duty. The duty so arising is absolute. The law requires nothing more; it will excuse nothing less than performance, although the degree of care to be exercised is relative to the circumstances of the case.
U.R.S. Co., Inc. v. Gulfport-Biloxi Regional Airport Authority, 544 So.2d 824 (Miss. 1989) (citing 38 Am.Jur. Negligence, pp. 656-67); Faulkner Concrete Pipe Co. v. Fox, 248 Miss. 50, 56, 157 So.2d 804, 805-06 (1963) (citing 38 Am.Jur. Negligence, § 14, pp. 656-67); Dr. Pepper Bottling Co. of Miss. v. Bruner, 245 Miss. 276, 282, 148 So.2d 199, 201 (1962) (citing 38 Am.Jur. Negligence, § 14, pp. 656-67); State for Use of Nat'l Surety Corp. v. Malvaney, 221 Miss. 190, 210-11, 72 So.2d 424, 431 (1954).
Catholic Charities agreed to and did use part of the adoption fee to "painstakingly and thoroughly" investigate the health and medical condition of the child to be adopted. This was their contractual duty, and thus under the law of Mississippi they should be held accountable if they breached that duty.

II. Breach of Duty
Though the majority does not precisely state that it finds that Catholic Charities did not breach any duty owed, it does state that it was not Catholic Charities' duty to conduct any test and it is necessary "to approach slowly any attempt to make an adoption agency liable for the health of children that they place [] when an adoption agency has done all that it could do before placing the child [, when] Catholic Charities informed the Fosters of all the information it had [, when] it conducted a painstakingly and thorough study [of Geoffrey's physical and medical health, and when i]t was involved in no misrepresentation or fraud." Based on the deposition testimony there is absolutely no way the majority can conclude that Catholic Charities did all it could do or that it conducted a "painstakingly and thorough study" of Geoffrey's physical and medical background. I quote from the deposition testimony of Dollie Hambrick, director of the adoption and maternity program at Catholic Charities:
Q. And you want to get as much information on this form and as accurate information as you can so that the parents will be fully apprised of the medical condition of the child; is that correct?
A. Yes.
Q. And Catholic Charities is also concerned about the health and welfare of the child so you want to fully apprise of the same; is that correct?
A. Yes.
.....
Q. You would agree with me that in this particular instance, the agency did not conduct a painstakingly thorough and time-consuming investigative procedure because it didn't mark the blank on the form one way or the other, did it?
A. The form was not marked, no.
.....
Q. The PKU blank was on the form because it was important information to *990 Catholic Charities to know whether the test had been done or not?
A. Yes.
[objection by counsel]
Q. And it was important because that was a part of the duty which Catholic Charities undertook to investigate the child's physical and mental health, correct?
A. Yes.
.....
Q. Nevertheless, in 1972 you asked, did you not, on your medical questionnaire under "Baby," line 9 or 10, you have a legend, "PKU" and a blank?
A. Yes.
Q. Now, was that supposed to be filled out by someone?
A. Yes.
Q. Who was opposed [sic] to fill that out?
A. I don't know.
Q. Didn't you tell me earlier that a caseworker in your agency was to fill out the form styled "Child Medical Information" from other information gleaned from official sources?
A. Yes, I would assume that.
.....
Q. Does it surprise you that there are so many entries missing on Exhibit 3? [the medical information form].
A. Yes, it does concern me that there are.
Q. Because, in the main, from your familiarity with the files, aren't these usually filled out almost in toto?
A. Yes.
Q. And if this one is not so filled out, then wouldn't it have been encumbent [sic] on Catholic Charities to go back and glean this additional information so that the file would be complete?
A. I don't know.
Q. Can you state your best estimate?
A. I would guess, yes.
Q. So, do you agree with me that this "Child Medical Information" form as filled out for this child is poor record keeping?
A. Yes.
Q. Also incomplete record keeping?
A. Yes.
.....
Q. Did Catholic Charities in 1972 have the means to see that the "Child Medical Information" form was filled out in full, including the PKU line?
A. I don't know. I wasn't there. I don't know.
Q. Do you now have the means? And by that, I mean access to the medical and physicians to get it filled out?
A. Yes, we do.
Q. Wouldn't you presume that you had the same means and facilities in 1972 that you have now?
A. I would guess, yes.
.....
Q. Now, is it the custom or practice when the form cannot be fully filled out by your caseworkers from records in the file that you go back to the delivering physician or child's pediatrician and seek additional information?
A. We now take what we get from the hospital and if  certainly if there is something that is not there, we do call back and get it.
Q. So, in 1972, since the PKU line on the form was empty, you could have gone back to a given hospital and a given physician, even the physician that I represent, Dr. John L. Bass, and asked him to fill out that line, couldn't you?
A. I'm sorry. Do that one again.
Q. You could have asked Dr. John L. Bass to assist you in filling out this form and to tell you what to put under the category P.K.U.?
A. Yes, I'm sure we could have.
.....
Q. In fact the policy of the Catholic Charities is to make full disclosure to the prospective parents of the health and medical condition of the child that they are adopting, isn't it?
A. Yes.

*991 Q. And in this particular case do you not agree that no such full disclosure was made to the Fosters?
A. Yes, the form is not complete.
.....
Q. Mrs. Hambrick, would agree with me that Catholic Charities' duty in this particular case was not to test Geoffrey Dufton Foster for PKU but to investigate his health and inform his parent of the findings of that investigation?
A. Yes, to talk to the doctors, yes.
Q. So, you do agree with me that you did have a duty to investigate the child's health, whether by talking to the doctors or getting the information off the records themselves, whatever procedure was followed, and to get that information into the hands of Kevin and Jean Foster?
A. Yes.
Q. And the brochure that I showed you earlier that I represented to you was received by my client at the time they went to Catholic Charities, characterizes that duty as a sacred trust; is that correct?
A. Yes, I believe so.
We have defined negligence as "the failure of one owing a duty to another to do what a reasonable and prudent person would ordinarily have done under the circumstances... ." Cole v. Delchamps, Inc., 246 Miss. 846, 152 So.2d 911, 913 (citing 38 Am.Jur., Negligence, par. 2, p. 643) (1963); see also, Smith v. City of West Point, 475 So.2d 816, 817 (Miss. 1985) (negligence connotes a failure to exercise reasonable care under the circumstances). What is reasonable care may vary with the circumstances. Smith, 475 So.2d at 818 [citing Knapp v. Stanford, 392 So.2d 196, 199 (Miss. 1980)].
The majority errs in stating Catholic Charities did all it could do and that it conducted a painstaking and thorough study. The evidence fails to support such findings, and this is especially so under our standard of review of a motion for summary judgment. See Marsalis v. Lehmann, 566 So.2d 217, 220 (Miss. 1990) (evidence must be viewed in the light most favorable to the nonmoving party); McMichael v. Nu-Way Steel and Supply, Inc., 563 So.2d 1371, 1375 (Miss. 1990) [citing Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984)] (same). Providing the Fosters the benefit of every reasonable doubt and placing the burden on Catholic Charities to prove that no genuine issue of fact exists, Marsalis, 566 So.2d at 220; McMichael, 563 So.2d at 1375, I find the evidence unequivocally creates a genuine issue of material fact whether Catholic Charities breached its duty to conduct a "painstakingly thorough and a time consuming investigative procedure".

III. Proximate Cause
The majority states that "[e]ven if Catholic Charities were negligent in completing the form, it does not necessarily follow that its negligence resulted in Geoffrey's injuries." I wholeheartedly agree. However, in reviewing a motion for summary judgment we are required to give the Fosters the benefit of every reasonable doubt and place the burden on Catholic Charities to prove that there is no genuine issue of material fact. Marsalis, 566 So.2d at 220; McMichael, 563 So.2d at 1375.
In this case, applying our standard of review, the duty was for Catholic Charities to conduct a "painstakingly and thorough investigation" into the health and medical condition of Geoffrey. If this duty was breached when the investigation was not properly performed and the Fosters were not put on notice that Geoffrey was not tested for PKU which, if not treated by diet therapy, would result, and did result, in his becoming mentally retarded, then the Fosters would have to show that had they known that the PKU test was not performed, they or their pediatrician who assessed Geoffrey would have altered their conduct, meaning a PKU test would have been done. See Wyeth Lab., Inc. v. Fortenberry, 530 So.2d 688, 691 (Miss. 1988).
The record shows that Dr. Nichols, Geoffrey's pediatrician, was not able to obtain the results of the previous medical assessment on Geoffrey because he did not know *992 the natural parents' name.[1] He stated that he would not interpret a blank next to the PKU space on Catholic Charities' "Child Medical Information Form" to mean a PKU had not been performed because at two weeks of age the PKU results usually were not back from the laboratory, and sometimes the results took up to two months to obtain. Dr. Nichols noted that although he could have inquired from Catholic Charities whether a PKU test had been done it was expected that the adopting agency would call the physician if there were a positive PKU test.
Reading the evidence in the light most favorable to the Fosters, I find that Dr. Nichols believed that a PKU test had been performed. He was not privy to the medical chart on Geoffrey as a newborn because he did not know the child's natural parents' name. Only Catholic Charities could obtain the information and had Dr. Nichols known a PKU test had not been performed on Geoffrey, he would have done one. Had he performed the test on Geoffrey at two weeks of age, Geoffrey's parents could have treated the disorder with diet therapy and Geoffrey would not be mentally retarded today. Thus, I find that there exists a genuine issue of material fact regarding proximate cause.
The majority also concludes that the hospital's medical staff's and treating physicians' negligence were superceding acts which absolved Catholic Charities of any negligence for which it might have been responsible. I find that whether the physician's or the hospital's acts were a contributing proximate cause or a superceding cause which became the sole proximate cause is a jury issue. See Maness v. Illinois Central R.R. Co., 271 So.2d 418, 423 (Miss. 1973) [citing Soloman v. Continental Baking Co., 172 Miss. 388, 160 So. 732 (1935)]; Smith v. Dillon Cab Co., Inc., 245 Miss. 198, 204, 146 So.2d 879, 881 (1962). This Court previously has found that:
As a general rule, it may be said that negligence, in order to render a person liable, need not be the sole cause of an injury. It is sufficient that his negligence, concurring with one or more efficient causes, other than plaintiff's fault, is the proximate cause of the injury. Accordingly, where several causes combine to produce injuries, a person is not relieved from liability because he is responsible for only one of them, it being sufficient that his negligence is an efficient cause, without which the injury would not have resulted, to as great an extent, and that such other cause is not attributable to the person injured. It is not defense to one of the concurrent tort-feasors that the injury would not have resulted from his negligence alone, without the negligence or wrongful acts of the other concurrent tort-feasor.
Smith v. Dillon Cab Co., Inc., 245 Miss. 198, 205-06, 146 So.2d 879, 882 (1962) (citing 65 C.J.S. Negligence § 110a, p. 675).
In summary we do not sit today as triers of fact, and the evidence is not sufficient to conclude as a matter of law that these acts were superceding intervening causes and the sole proximate cause of the damage. The record in this case indicates that Catholic Charities owed the Fosters a duty to conduct a "painstakingly and thorough investigation" into the medical and physical condition of Geoffrey. The record further shows that there are genuine issues of material fact whether the duty was breached, and if so, whether the breach was the proximate cause of Geoffrey's injuries. I would find that the lower court committed reversible error in granting Catholic Charities' motion for summary judgment. The Fosters should be permitted a full trial on the merits.
PITTMAN, J., joins this dissent.
NOTES
[1] Throughout this opinion, "Foster" sometimes refers to the parents and child; sometimes just the parents; and sometimes just the child. In most instances when referring to the child alone, we use his first name, "Geoffrey".
[2] The bulk of this information comes from information provided by two doctors and submitted by the appellant. For a brief discussion of PKU see Nyham, The Heredity Factor: Genes, Chromosomes & You, 214-29 (1976); see also, Stedman, Stedman's Medical Dictionary, 1072 (1984).
[3] One of the plaintiff's witnesses, in a deposition, estimated that PKU occurs only once in every 10-12,000 Caucasian deliveries.
[4] A copy of this form is supplied as an appendix to this decision.
[5] Foster insists that Catholic Charities obviously recognized the necessity for and importance of testing each newborn for PKU as shown by the place on its child medical information form marked "PKU" with a space for the results of the test.
[6] These elements also have been listed as:

(1) Plaintiff must be protected under some rule of law against defendant's conduct (duty); (2) Defendant's conduct must have violated this duty (breach); (3) Plaintiff's injury must be result of defendant's conduct (causal relationship); and (4) Plaintiff must have suffered a loss (damage).
Ward v. Hobart Manufacturing Co., 450 F.2d 1176, 1181 (5th Cir.1971).
[7] But, cf. Harper, James & Gray, The Law of Torts, § 18.8, at 743 (2d. 1986), the general rule has too often been stated without enough critical appraisal. The duty issue, like any other can be broken down into (a) rules and (b) the application of those rules to the concrete facts of a given case. Here as elsewhere the court lays down the rules. But the application of those rules to particular facts should be and in fact usually is, committed to the jury on the duty issue as upon any other.
[8] This particular quotation provided in Smith is not found in Sturdivant. This language, however, is found in Headnote 8 of Sturdivant, 65 So.2d at 292. In any event, Sturdivant, does provide that the probability of injury must be reasonable and it has to have been anticipated by a reasonably prudent person. "But the actor is not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence, although such happening is within the range of possibilities." Id. at 100, 65 So.2d at 294.
[9] The disease is rare from the viewpoint of Catholic Charities as well as Geoffrey's treating physician.
[10] Dr. Margretta R. Seashore is Associate Professor at Yale University School of Medicine. She is a member of several professional societies including the American Society of Human Genetics. In addition she is familiar with this case because Geoffrey is one of her patients.
[11] "Knowledge is fundamental to liability for negligence. The very concept of negligence presupposes that the actor eithir does foresee an unreasonable risk of injury, or could foresee it if he conducted himself as reasonably prudent person. Foreseeability of harm ... must depend on knowledge." Harper, James, & Gray, supra, § 16.5 at 397-98.
[12] In many other instances a child is transferred from the hospital to a foster home, and he then is under the direct supervision of agency caseworkers.
[13] In pertinent part, the original statute provides that "[t]he physician attending a newborn child, or the person attending a newborn child that was not attended by a physician, may provide the child tests for hypothyroidism and phenylketonuria that have been approved by the state board of health ..." Laws, 1979, Ch. 388 § 2.

Today that statute provides that "[f]rom and after July 1, 1988, the physician attending a newborn child, or the person attending a new born that was not attended by a physician, shall provide the child tests... . (Supp. 1989).
[14] The complete context of this paragraph reads as follows:

In placing her child for adoption, the mother entrusts the agency with the sacred obligation of meeting her own responsibilities for the child's spiritual an material welfare. In accepting the child, the agency assumes a sacred trust to the mother, to the child, and also to the adoptive parents.
[15] The complete paragraph follows:

To meet this sacred trust, the agency must conduct a painstakingly thorough and time consuming investigative procedure. The procedure demands a careful study of the child's parents; the child's physical and mental health and potential; the qualifications of adoptive parents and their ability to provide adequate opportunities for the child, and the possible adjustment of the child to its new parents.
[16] In addition, this brochure also explained that "the agency must meet its sacred trust, and in so doing must rely on the expert and professional advice of many people." This includes the treating physicians.
[17] See, Appendix, infra.
[18] Although being "uncircumcised" is visible, and therefore different from PKU, it simply underscores the significance that PKU symptons can not be detected. Any discovery of the symptons ought to be left to those who can best determine their existence. Cf. Michael J. v. County of Los Angeles, Department of Adoptions, 201 Cal. App.3d 859, 247 Cal. Rptr. 504 (Cal. App. 2 Dist. 1988), discussed infra, at 979-980 (port wine stain. a manifestation of Sturge-Weber Syndrome, on child's upper torso and face).
[19] It's interesting to note that Foster has not asserted that Catholic Charities was negligent in leaving the name of the attending physician off the medical information form.
[20] According to the county's record, the examining doctor in this case would not make a definite statement as to the prognosis for the child. Id. 247 Cal. Rptr. at 505.
[21] Cf. Note, The Emergence of Wrongful Adoption as a Cause of Action, 27 J. of Fam. Law 475, 475 (1988-89). (It is well established, and logical, that parties placing children for adoption are not guarantors of the children's future good health. Undetectable problems are another risk associated with the decision to become a parent, whether by birth or adoption.) Id. at 475. See also, Annot., Action for Wrongful Adoption Based on Misrepresentation of Child's Mental or Physical Condition or Parentage, 56 A.L.R. (4th) 375 (1987).
[22] We could only imagine what type of litigation would come to the courts if Catholic Charities were deemed liable in the case sub judice. Adoption agencies provide a valuable service to childless couples and to individuals who want to increase the size of their family. When tragedies such as this occur, we can not put an agency at fault because a child did not conform to specifications that adopting parents desire. To do so would put adoption agencies in a quagmire because they want to continue to provide this service. Yet, they could not afford an unreasonable responsibility of guranteeing the health of a child. Even natural parents are without this guarantee. When their child is born healthy and continues to be healthy, they simply must thank a Higher Authority.
[1] Catholic Charities is the only party who could obtain medical information from the natural parents or Dr. Bass, who assessed Geoffrey as a newborn.