THEODORE MOHR & others[1] *vs.* COMMONWEALTH
& another.[2]

Bristol. March 9, 1995. - August 14, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, & GREANEY, JJ.

*Limitations, Statute of. Actionable Tort. Adoption,* "Wrongful adoption."
*Public Policy. Intentional Conduct. Negligence,* Adoption agency. *Massachusetts Tort Claims Act.*

An action brought by adoptive parents against the Commonwealth for negligent misrepresentation before the adoption of the medical and family history of the child was not barred by the statute of limitations where the plaintiffs commenced their action within three years of the date when the plaintiffs knew or should have known that they had been harmed by the defendant's conduct. [155-156]

Discussion of cases recognizing a cause of action in tort allowing adoptive parents the right to seek compensatory damages against an adoption agency for the agency's negligent material misrepresentations of fact prior to adoption concerning the adopted child's history [156-159, 160-161], and discussion of cases in which courts have declined to extend liability to cases involving negligent, rather than intentional, misrepresentation by an adoption agency [159-160].

This court recognized a cause of action for claims of "wrongful adoption" based on both intentional and negligent misrepresentation to adoptive parents about a child's history prior to adoption. [161-164]

The discretionary function exception to governmental tort liability, G. L. c. 258, § 10 (*b*), does not extend to the acts of a social worker, employed by a State agency, in accordance with agency policy in not disclosing a biological parent's mental illness to the prospective adoptive parents of a child. [164-166]

At the trial of an action against the Commonwealth, error, if any, in the judge's instructions to the jury with respect to the applicability of certain State regulations was harmless where it could not have influenced the jurors' deliberations. [166]

---

[1]Hazel Mohr, individually and as guardian of the person and estate of Elizabeth Ann Mohr.

[2]Pamela Tompkins.

There was no merit to plaintiffs' assertion on appeal that the judge errone-
ously instructed the jury with respect to their claim for intentional mis-
representation. [166-167]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 27, 1987.

The case was tried before *John J. O'Brien,* J.

The Supreme Judicial Court granted an application for di-
rect appellate review.

*Owen Gallagher,* Special Assistant Attorney General, for
the Commonwealth.

*Stephen P. Sheehan,* of Rhode Island, for the plaintiffs.

*John T. Landry, III,* Special Assistant Attorney General,
for Pamela Tompkins.

LIACOS, C.J. The Commonwealth appeals from a judgment
awarding the plaintiffs $200,000 based on jury findings that
the Commonwealth negligently misrepresented the medical
and family history of a child (Elizabeth) adopted by the
plaintiffs, and that the Commonwealth was liable for the
plaintiffs' uninformed consent to adopt Elizabeth. The plain-
tiffs cross appeal from a judgment entered in favor of the
codefendant, Pamela Tompkins (a social worker in the adop-
tion placement unit of the Department of Public Welfare),
on the plaintiffs' claim that Tompkins intentionally failed to
disclose to them the mental illness of the child's biological
mother.

The plaintiffs commenced this action in January, 1987.
They alleged that the defendants negligently failed to provide
accurate and complete information about Elizabeth's back-
ground, particularly her medical and family history, as well
as her probable needs for future treatment and care, and that
this negligence caused them harm. The plaintiffs also alleged
that Tompkins made misrepresentations and fraudulently
concealed from them certain background information about
Elizabeth.

The case was tried to a jury in October, 1991. At the close
of the evidence, the defendants filed motions for directed ver-

dicts. The judge denied the motions as to the claims against the Commonwealth and the intentional tort claims against Tompkins.[3] In response to special questions, the jury found that the Commonwealth's negligence proximately caused the plaintiffs' injuries, and that the Commonwealth was liable for the plaintiffs' uninformed consent.[4] The jury also found that Tompkins was not liable for an intentional tort. The judge denied the Commonwealth's motion for judgment notwithstanding the verdict or for a new trial, and denied the plaintiffs' motion for a new trial against Tompkins. Both sides timely appealed, and this court granted a joint application for direct appellate review.

On appeal, the Commonwealth asserts that (1) its failure to disclose the biological mother's mental health history was not inherently unknowable at the time of Elizabeth's adoption in 1976, and that the plaintiffs failed to commence the action within the time allowed by the statute of limitations; (2) this court should decline to recognize a cause of action for wrongful adoption based on negligence; (3) the judge erroneously failed to instruct the jury on comparative negligence; (4) the Commonwealth's decision not to disclose information about Elizabeth's biological mother's history of mental illness was a discretionary function entitling the Commonwealth to immunity pursuant to G. L. c. 258, § 10 (b) (1994 ed.); (5) the judge erred in instructing the jury to determine whether regulations promulgated in 1972, 1974, or 1976 governed the Commonwealth's duty to disclose certain

---

[3]In addition, the plaintiffs had alleged that the Commonwealth negligently failed to place Elizabeth in a safe foster home and negligently failed to remove her from an abusive and neglectful foster home, and that this negligence caused her extreme pain and suffering, mental anguish and emotional distress. At trial, the judge allowed the Commonwealth's motion to dismiss this claim. Also, the negligence claim against Tompkins individually was not submitted to the jury. See G. L. c. 258, § 2 (1994 ed.).

None of these issues is before us in this appeal.

[4]The jury found that $3.8 million would fairly and adequately compensate the plaintiffs for their damages. The judge granted the Commonwealth's motion to amend or alter the judgment to $200,000 with no interest, the amount permitted by G. L. c. 258, § 2.

information to the plaintiffs; and (6) the doctrine of informed consent does not apply to a wrongful adoption action.

In their cross appeal, the plaintiffs contend that the judge erred in instructing the jury that Tompkins would not be liable for an intentional tort if she acted pursuant to orders of her superiors in not disclosing information to the plaintiffs.

*Facts.* We recite some of the facts that the jury could have found from the evidence admitted.

Elizabeth was born on January 15, 1968. At that time, her mother was a committed patient at Worcester State Hospital and was under the care of the Department of Mental Health. The mother agreed to give up Elizabeth for adoption. Elizabeth was placed in foster care by the Department of Public Welfare (department) for five years. Within a few months after her birth, it became apparent that Elizabeth was missing early developmental milestones. A department social worker took Elizabeth to a neurologist, who concluded that she "show[ed] definite evidence [of] retarded growth and development of unknown etiology." In January, 1969, Elizabeth was admitted to Springfield Hospital for a complete neurological evaluation. Her admission and discharge diagnoses were "mental retardation." Tests conducted while Elizabeth was an inpatient indicated that she had "moderate cerebral atrophy."

In September, 1973, Elizabeth was removed from her foster home and admitted to Springfield Hospital for "failure to thrive." During this hospitalization, a physician recommended that Elizabeth undergo a more complete psychological evaluation. The department did not follow this recommendation. Instead, Elizabeth was discharged with a diagnosis of "[f]ailure to thrive, probably due to environmental deprivation. Prognosis: Good." On discharge, responsibility for Elizabeth's care was transferred from the Springfield regional office of the department to its adoption placement unit in Boston, which placed her in the Nazareth Child Care Center for adoption preparation.

Sometime in the early 1970s, the Mohrs approached the department seeking to adopt a child. They attended several

educational meetings sponsored by the department. They knew that the children available for adoption were older children, some of whom had suffered emotional trauma as a result of disruption in their biological families, inadequate foster care, and other factors. The plaintiffs also knew that certain "special needs" children, which included children with psychological or physical handicaps, were available for adoption and that an adoption subsidy would be offered to facilitate placement of such children.[5] Hazel Mohr acknowledged attending meetings at which the available children's emotional and behavioral problems were discussed. She also understood that there was a potential risk of mental illness or retardation, but did not remember any specific discussion of such issues. In their adoption application, the plaintiffs indicated that they would accept a child with a "[c]orrectable medical problem. Emotion[al] problem — we would consider."

In March, 1974, Pamela Tompkins, the social worker responsible for Elizabeth's adoption placement, notified the plaintiffs that six year old Elizabeth was available for adoption. Tompkins told the plaintiffs about Elizabeth's ethnic background, her placement in foster care from birth, and that the department had no background information about the father. Tompkins also told the plaintiffs that Elizabeth's mother had "blonde hair, blue eyes, fair coloring, [was] 5 foot, 1 inch tall, 130 pounds [and that she] liked to cook, liked dogs . . . was young and she wanted to go into nursing." Tompkins also told the plaintiffs that Elizabeth had been removed from foster care because of alleged abuse and had been hospitalized for malnutrition, and that she was small for her age and had been examined for dwarfism. Hazel Mohr testified that Tompkins provided no other information about Elizabeth's medical history or familial background at any time, and that she told the plaintiffs that no medical records concerning Elizabeth were available. Although

[5]The plaintiffs responded that they did not feel they could consider "special needs" children.

Tompkins knew of a record stating that Elizabeth's birth mother was schizophrenic, she did not disclose that information to the plaintiffs.

After they learned that Elizabeth was available for adoption, the plaintiffs visited her weekly for several months. In July, 1974, Elizabeth went to live with the plaintiffs. The next month, Tompkins sent Elizabeth's medical records to Dr. Raymond Guillette, whom the plaintiffs had selected to be Elizabeth's pediatrician. The records revealed Elizabeth's medical history, including physicians' concerns about retardation. The records also detailed the birth mother's diagnosis of "Schi[z]ophrenic Reaction Chronic Undifferentiated Type manifested by emotional immaturity and instability."

In November, 1975, the plaintiffs took Elizabeth to Joseph P. Kennedy Jr. Memorial Hospital for neurological testing. Dr. Edward J. Hart, the evaluating physician, described Elizabeth as having a "considerable behavioral disruption" and as "a child of probably low average intelligence" who was two years behind her developmental level. Dr. Hart recommended therapy with the whole family and an inpatient evaluation to determine whether Elizabeth's problems were organic or related to early emotional deprivations. The plaintiffs did not choose to follow this recommendation.

In August, 1976, the plaintiffs adopted Elizabeth after she had lived with them for two years. Nine years later, in January, 1984, they decided to have Dr. Hart conduct the inpatient evaluation that he had suggested in 1975. The admission procedures required that the plaintiffs obtain Elizabeth's immunization records. In the course of obtaining those records, Hazel Mohr first learned that Dr. Guillette had received medical records from the department. She also then discovered that Elizabeth's birth mother had been diagnosed as schizophrenic[6] and that Elizabeth's early infant develop-

---

[6]One of the plaintiffs' experts testified that the familial nature of schizophrenia has been recognized for over one hundred years. He also testified that a child born to a schizophrenic mother would be fifteen times as likely to develop schizophrenia as a child in the general population. He further testified that Elizabeth suffers from borderline or latent schizophrenia, and

ment had been stunted. In addition, Hazel Mohr then learned that Elizabeth had been diagnosed with "cerebral atrophy." The plaintiffs testified at trial that they would not have adopted Elizabeth if this information had been disclosed to them.

According to the plaintiffs, the department's employees told them prior to the adoption that the only background information that would not be disclosed to them was the identity of the biological parents. They assert that Tompkins knew, but did not disclose to them, that:

> (a) the birth mother was a committed . patient at Worcester State Hospital when Elizabeth was born, with a diagnosis of chronic schizophrenia.

> (b) the birth mother had an IQ score of eighty-three (dull normal level).

> (c) the foster mother with whom Elizabeth was first placed one month after birth was concerned that the infant was not developing as quickly as she should.

> (d) a developmental examination at eighteen weeks concluded that Elizabeth's "development is not satisfactory."

> (e) a follow-up examination at thirty-nine weeks found that many of Elizabeth's abilities were at the twenty-week level and that "[h]er general maturity level . . . is around 24 weeks and this being the second examination to show retardation, it takes on a more serious import."

---

that the facts concerning her biological mother's schizophrenia would have been very important for a correct assessment of Elizabeth's prognosis when she was presented to the plaintiffs in 1974. Another expert testified that it would have been possible to determine in 1974 that there was not "any way that this young woman would have attained normal cognitive development; have been able to function the way the vast majority of children do . . . [and] that there was [not] any way, given this history, that she would have attained normal emotional status."

(f) at an October 31, 1968, examination, a neurologist found that Elizabeth "shows definite evidence [of] retarded growth and development of unknown etiology."

(g) in January, 1969, a complete neurological examination conducted by Springfield Hospital diagnosed "mental retardation." A pneumoencephalogram revealed bilaterally enlarged ventricles, which were interpreted as "diagnostic of moderate cerebral atrophy." Her prognosis was "guarded."

(h) by October, 1973, Elizabeth's height and weight had declined from the fiftieth to the third percentile.

(i) when Springfield Hospital evaluated Elizabeth in 1973, a physician recommended that she be admitted to the hospital's Child Guidance Center for a complete psychological evaluation. That was not done. Instead, Elizabeth was discharged with a diagnosis of failure to thrive.

(j) the supervisor of social service at the Springfield office of the Division of Family and Children's Services (now the Department of Social Services) objected to transferring "this five year old retarded, emotionally disturbed child whose physical ailments have not yet been diagnosed" to the Adoption Placement Unit in Boston. This objection was not heeded.

Tompkins did not disclose the above information in the petition that she prepared for submission to the Probate Court in connection with Elizabeth's adoption. In the petition, she stated only that Elizabeth "was developing below average due to environmental deprivation, but had potential for further development." Tompkins described the biological mother as "generally in good health," and stated that "[b]ecause of the severe marital problems of [her] parents, [the mother] had a problem with interpersonal relationships and was unable to meet the needs of a baby." The plaintiffs' expert on adoption testified that, by 1974, there was consen-

sus in the field of social work that schizophrenia and mental retardation in the biological family should be disclosed to adoptive parents prior to placement.

At the time of trial, Elizabeth lived at home and was incapable of caring for herself. Medical records admitted in evidence indicated that Elizabeth is mentally retarded, with a verbal scale IQ of seventy-seven and a performance scale IQ of fifty-five. The plaintiffs testified that they would not have adopted or even agreed to meet Elizabeth if facts concerning her retardation during infancy or her mother's schizophrenia had been disclosed. They commenced this action in order to recover sufficient damages to enable them to provide for the structured, residential placement that Elizabeth will need throughout her lifetime.

I. *Statute of limitations.* The plaintiffs commenced this action against the Commonwealth on January 27, 1987, approximately eleven years after they adopted Elizabeth, alleging that the Commonwealth had wrongfully misrepresented the child's medical and familial background. The Commonwealth asserted a statute of limitations defense in its answer, as well as in its motions for a directed verdict and for judgment notwithstanding the verdict. On appeal, the Commonwealth contends that the judge should have determined as a matter of law that the statute of limitations barred the plaintiffs' action because the biological mother's history of mental illness was not "inherently unknowable" at the time that Elizabeth's adoption was finalized in 1976.[7]

---

[7]The Commonwealth asserts that the three year statute of limitations articulated in G. L. c. 260, § 2A (1994 ed.), governs this case. Apparently the Commonwealth applies that provision because it assumes that the plaintiffs' cause of action accrued in 1976, before G. L. c. 258 (Massachusetts Tort Claims Act) was enacted. However, as we note in this opinion, the jury found that the plaintiffs' cause of action accrued in February, 1984. Hence, we believe that the applicable statutory provision is G. L. c. 260, § 3A, which governs claims brought against the Commonwealth under G. L. c. 258. This provision, like G. L. c. 260, § 2A, requires that claims be brought within three years after the cause of action accrues.

The Commonwealth does not argue on appeal that the plaintiffs did not comply with the provisions for presentment contained in G. L. c. 258, § 4 (1994 ed.).

We have recognized the "unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another." *Bowen* v. *Eli Lilly & Co.*, 408 Mass. 204, 205 (1990). Thus, we have developed a "discovery rule" for determining, in the absence of a governing statute, when a cause of action accrues and triggers the beginning of the statutory period. See *id.* See also *Hendrickson* v. *Sears*, 365 Mass. 83, 83-84 (1974). The discovery rule "prescribes as crucial the date when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct." *Bowen* v. *Eli Lilly & Co., supra* at 205-206.

In response to special questions, the jury found that "2/ 84" was "the date when the plaintiffs either or both, knew or in the exercise of reasonable diligence should have known of the material facts which are the basis of this action." Thus, under the discovery rule, the plaintiffs' cause of action accrued in February, 1984. See *Bowen* v. *Eli Lilly & Co., supra* at 207, citing *Franklin* v. *Albert*, 381 Mass. 611, 618 (1980). We conclude that the plaintiffs satisfied their burden of proving that they commenced this action within the three year statutory period. See *Lariviere* v. *Lariviere*, 304 Mass. 627, 628 (1939); *Pike* v. *Proctor*, 303 Mass. 535, 536 (1939); *Breen* v. *Burns*, 280 Mass. 222, 228 (1932).

II. "*Wrongful adoption*" *tort.* We decide today whether we should recognize a cause of action in tort which would allow adoptive parents the right to seek compensatory damages against an adoption agency for the agency's negligent material misrepresentations of fact prior to adoption concerning the adopted child's history.

In 1986, in *Burr* v. *County Comm'rs of Stark County*, 23 Ohio St. 3d 69, 75 (1986), the Supreme Court of Ohio became the first State supreme court to recognize the tort of

"wrongful adoption."[8] In that case, the court affirmed a jury verdict finding an adoption agency liable in tort for making material misrepresentations to adoptive parents about a child's background and physical condition. *Id.* at 78. During the ensuing years, the child suffered from a number of physical and mental problems and was classified as mentally retarded. *Id.* at 70. Eventually, he was diagnosed as suffering from Huntington's disease, a genetically inherited condition. *Id.*

When the plaintiffs obtained a court order to open the sealed records concerning the child's background prior to adoption, the records revealed that the biological mother was a thirty-one year old mental patient and that the child was born at a State mental institution. *Id.* The mother shared the child's low intellectual level, had a speech impediment, and was diagnosed as having a "mild mental deficiency, idiopathic, with psychotic reactions." *Id.* The biological father was unknown, but was presumed to be a mental patient. *Id.* In addition, other information provided by the adoption agency about the child apart from his age and sex was untrue. The plaintiffs claimed that they would not have adopted the child had it not been for the defendants' fraudulent conduct. *Id.*

The Supreme Court of Ohio held that the adoptive parents could recover where they were fraudulently misled to their detriment by an adoption agency's material misrepresentations of fact about the infant's background and condition, so long as they proved each element of the tort of fraud. *Id.* at 73. Because "the record amply support[ed] the lower courts' decisions that fraud was demonstrated," the court affirmed

---

[8]The term "wrongful adoption" is commonly used, but it adds no more to a proper analysis than the counterpart term of "wrongful birth." See *Viccaro v. Milunsky*, 406 Mass. 777, 779 n.3 (1990). As well stated by Justice Murray in *Mallette v. Children's Friend & Serv.*, 661 A.2d 67, 69 (R.I. 1995), "[T]he question of whether to recognize causes of action for 'wrongful adoption' simply requires the straightforward application and extension of well-recognized common-law actions, such as negligence and fraud, to the adoption context and not the creation of new torts."

the jury verdict against the defendants. *Id.* In so holding, the court stated that "[a]s a public agency charged with the legal duty and authority to arrange adoptions . . . governing principles of justice . . . require that [the defendants] be held accountable for injuries resulting from deceitful and material misrepresentations which we find were foreseeably and justifiably relied on by [the plaintiffs]." *Id.* at 75.

Other jurisdictions subsequently have followed the Ohio Supreme Court in recognizing a cause of action for "wrongful adoption" based upon an adoption agency's misrepresentations to parents prior to adoption. See, e.g., *Roe v. Catholic Charities of the Diocese of Springfield*, 225 Ill. App. 3d 519, 524, 538 (1992) (agency told three sets of adoptive parents that the particular children they planned to adopt were normal in physical and mental condition as well as level of development, despite its knowledge that children had exhibited violent and uncontrollable behavior while in foster care, and that two children suffered from social and emotional retardation); *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 284-285, 288 (Minn. 1992) (agency told adoptive parents there was "possibility of incest in the family," despite its knowledge that child's biological parents were a seventeen year old boy and his thirteen year old sister); *Gibbs v. Ernst*, 538 Pa. 193, 217-218 (1994) (despite specific inquiry by adoptive parents, agency failed to disclose that child had long history of physical and sexual abuse by biological parents, that he had been neglected by biological mother, that he had extensive history of aggressiveness and hostility toward other children, that biological mother at one time attempted to cut off his penis, and that he had been in and out of foster care during his first six years); *Meracle v. Children's Serv. Soc'y of Wis.*, 149 Wis. 2d 19, 32-33 (1989) (agency told adoptive parents that child's biological father had tested negative for Huntington's disease and therefore child had no more chance of developing it than any other child, even though paternal grandmother had died of Huntington's disease and no reliable test existed to determine whether biological father had it; child subsequently diagnosed as having Huntington's dis-

ease). See *Roe* v. *Catholic Charities of the Diocese of Springfield, supra* at 524 ("Recognition of this cause of action is not a dramatic, radical departure from the well-established common law . . . . It is rather an extension of the doctrine of common law fraud. This is how the common law traditionally grows; it responds to the needs of the society it serves"). See also *Juman* v. *Louise Wise Servs.*, 159 Misc. 2d 314, 320 (N.Y. Sup. Ct. 1994), aff'd, 211 A.D. 2d 446 (N.Y. 1995). We agree that the straightforward application of well-established common law principles supports recognition of a cause of action in tort for an adoption agency's material misrepresentations of fact to adoptive parents about a child's history prior to adoption. See *Mallette* v. *Children's Friend & Serv.*, 661 A.2d 67, 69 (R.I. 1995).

Next we must consider whether, as the Commonwealth contends, public policy concerns dictate that we should limit liability for "wrongful adoption" to claims based on intentional conduct. The Commonwealth relies on several cases in which courts have declined to extend liability to cases involving negligent, rather than intentional, misrepresentation by an adoption agency. For example, in *Burr* v. *County Comm'rs of Stark County, supra* at 78, the court stated that "[i]t is not the mere failure to disclose the risks inherent in [the] child's background which we hold to be actionable [but] the deliberate act of misinforming [the plaintiffs] which deprived them of their right to make a sound parenting decision and which led to the compensable injuries." Similarly, in *Michael J.* v. *Los Angeles County Dep't of Adoptions*, 201 Cal. App. 3d 859, 874-875 (1988), the California Court of Appeal stated that "an adoption agency cannot be made the guarantor of an infant's future good health and should not be liable for mere negligence in providing information regarding the health of a prospective adoptee." See *Richard P.* v. *Vista Del Mar Child Care Serv.*, 106 Cal. App. 3d 860, 866-867 (1980) (court stated that "no cause of action for negligence should be recognized based on considerations of public policy"); *Foster* v. *Bass*, 575 So. 2d 967, 981

(Miss. 1990) (court refused to recognize tort of negligence in adoption context because result not foreseeable). See also *Juman* v. *Louise Wise Servs.*, 211 A.D.2d 446, 447 (N.Y. 1995) (recognizing "wrongful adoption" cause of action grounded in fraud and fraudulent misrepresentation).

Other courts, however, have held that, apart from claims based on allegations of fraud or intentional misrepresentation of material fact, public policy also supports recognizing the tort of negligent misrepresentation in the adoption context. See, e.g., *Roe* v. *Catholic Charities of the Diocese of Springfield, supra* at 536-537; *Gibbs* v. *Ernst, supra* at 211; *Meracle* v. *Children's Serv. Soc'y of Wis., supra* at 32-33. See also *M.H.* v. *Caritas Family Servs., supra* at 288 (allowing negligent misrepresentation action against adoption agency which, having undertaken to disclose information about child's biological parents and medical background to adoptive parents, "negligently withholds information in such a way that the adoptive parents were misled as to the truth"). These courts have emphasized "the compelling need of adoptive parents for full disclosure of medical background information that may be known to the agency on both the child they may adopt and the child's genetic parents, not only to secure timely and appropriate medical care for the child, but also to make vital personal, health and family decisions." *Id.* at 287. See *Roe* v. *Catholic Charities of the Diocese of Springfield, supra* at 537. This need, according to these courts, outweighs any increased burden that is placed on adoption agencies when liability is imposed for negligent as well as intentional misrepresentation. See *id.* In addition, these courts have maintained that allowing negligent misrepresentation claims against adoption agencies does not subject agencies to potentially limitless liability or make them guarantors of adopted children's health. *Meracle* v. *Children's Serv. Soc'y of Wis., supra* at 32.[9]

---

[9]We note that, like the plaintiffs in this case, none of the plaintiffs in the above-cited cases sought to nullify the adoption decree because of the adoption agency's alleged misrepresentations. Cf. *County Dep't of Pub. Welfare of St. Joseph County* v. *Morningstar*, 128 Ind. App. 688, 689

In Massachusetts, we have recognized that biological parents have a cause of action in tort for negligent failure properly to perform a sterilization surgical procedure to avoid the birth of even a healthy child. *Burke* v. *Rivo,* 406 Mass. 764, 772 (1990). Further, as to a child born with a congenital or genetic disorder, we have recognized, and agreed with the principle that, "[i]f a child is born with a congenital or genetic disorder, almost all courts have allowed the parents to recover against a negligent physician the extraordinary medical, educational, and other expenses that are associated with and are consequences of the disorder." *Viccaro* v. *Milunsky,* 406 Mass. 777, 780 (1990). Most recently, in regard to adoption, in a case almost on all fours with the case at bar, the Supreme Court of Rhode Island has stated in *Mallette* v. *Children's Friend & Serv., supra* at 71, "[w]hen [the defendant] began allegedly volunteering information concerning [the child's] and his biological mother's medical and genetic background, the agency assumed a duty to refrain from making negligent misrepresentations." We agree.

Although we acknowledge the "necessity to approach slowly any attempt to make an adoption agency liable for the health of the children that they place," *Foster* v. *Bass, supra* at 981, we believe that the preferable approach is to allow liability for "wrongful adoption" for claims based on both intentional and negligent misrepresentation to adoptive parents about a child's history prior to adoption. We add that an adoption agency does have an affirmative duty to disclose to adoptive parents information about a child that will enable them to make a knowledgeable decision about whether to accept the child for adoption. See 110 Code Mass. Regs. § 7.213 (3) (1994) ("[t]he Department [of Social Services] shall provide the adoptive parent with all relevant information about a child to enable the adoptive parent to knowl-

---

(1958); *Allen* v. *Allen,* 214 Or. 664, 665 (1958); *In re Lisa Diane G.,* 537 A.2d 131, 132 (R.I. 1988).

edgeably determine whether to accept the child for adoption").[10]

Several considerations support our conclusion. First, as noted above, there is a compelling need for full disclosure of a child's medical and familial background not only to enable adoptive parents to obtain timely and appropriate medical care for the child, but also to enable them to make an intelligent and informed decision to adopt. We acknowledge that there always are certain risks associated with having a child, whether biologically or through adoption. "However, just as couples must weigh the risks of becoming natural parents, taking into consideration a host of factors, so too should adoptive parents be allowed to make their decision in an intelligent manner." *Burr v. County Comm'rs of Stark County, supra* at 78. In order to enable adoptive parents to "assume the awesome responsibility of raising a child with their eyes wide open," *Roe v. Catholic Charities of the Diocese of Springfield, supra* at 537, an adoption agency must disclose fully a child's medical and familial background.[11] Full disclosure is particularly necessary in the adoption context, where often the adoption agency is the only party with access to information about a child's medical and genetic background.[12] In addition, we believe that this result, rather

---

[10]We believe that the notion of good faith and fair dealing dictates that the affirmative duty to disclose to adoptive parents information about a child's background applies to private adoption agencies as well as to State agencies. See *Underwood v. Risman*, 414 Mass. 96, 99-100 (1993) (duty exists under G. L. c. 93A to disclose material facts known to party at time of business transaction); Restatement (Second) of Torts § 551 (1977) (addressing duty to disclose in business transaction).

[11]This is not a case where an adoption agency placed a child without discovering and informing the potential adoptive parents about the child's medical and familial background. Thus, we need not and do not address whether and to what extent an agency has a duty to investigate a child's background.

[12]The Commonwealth asserts that the judge erred in declining to instruct the jury on comparative negligence, because the plaintiffs independently should have discovered the facts withheld by Tompkins and thereby averted their injury. We conclude that the plaintiffs had no duty to conduct the type of investigation suggested by the Commonwealth. In the absence of a duty, there can be no liability for negligence. See *Davis v. West-*

than inhibiting adoption, will encourage it because "it will give potential parents more confidence in the adoption process and in the accuracy of the information they receive." *Meracle* v. *Children's Serv. Soc'y of Wis.*, *supra* at 32. See *Mallette*, *supra* at 72 ("We are in complete agreement with these cases in holding that public policy does not preclude the [plaintiffs] from maintaining a claim for negligent misrepresentation . . . . In fact recognition of such a tort would promote public policy").

Second, our conclusion applies accepted tort principles to the interactions between adoption agencies and potential adoptive parents during the adoption process. We do not believe that adoption agencies should be exempt from tort liability for false statements negligently made during the adoption process. In reaching this conclusion, we note that the Legislature has not acted affirmatively to provide adoption agencies immunity from common law sanctions for negligence. See *Gibbs* v. *Ernst*, *supra* at 207 ("The causes of action . . . are so well established that we find affirmative action by the legislature, rather than silence, would be necessary to prevent their application in the adoption context").

Third, allowing liability for negligent as well as intentional "wrongful adoption" does not impose any "extraordinary or onerous" burden on adoption agencies. See *M.H.* v. *Caritas Family Servs.*, *supra* at 287. To avoid liability for "wrongful adoption" based on negligence, an agency need only use due care to ensure that it fully and adequately discloses information about a child's background so as not to mislead potential adoptive parents. Thus, we do not agree with the Commonwealth that allowing liability for negligent misrepresentation would "burden [State] adoption agencies with greater costs for verification of family histories and discovery of hidden genetic-related conditions." Indeed, in light of the emotional, physical and financial problems that can result from an

*wood Group*, 420 Mass. 739, 742-743 (1995). Thus, the judge did not err in declining to give an instruction on comparative negligence.

agency's affirmative misrepresentations about a child's medical and familial background, any increased burden upon adoption agencies is slight. Furthermore, "the common law notion of foreseeability as found in the concepts of duty and proximate cause" prevents the tort of negligent "wrongful adoption" from making adoption agencies guarantors of children's future health. See *Gibbs* v. *Ernst, supra* at 211.

Fourth, we do not believe that a negligent "wrongful adoption" cause of action conflicts with the biological parents' interest in keeping their identities confidential. Adoption agencies could provide information about a child's medical and familial background without disclosing the biological parents' identities. This disclosure would be similar to that approved in G. L. c. 210, § 5D (1994 ed.), which authorizes the release of "nonidentifying information" concerning a biological parent's "medical, ethnic, socio-economic, and educational circumstances." Fifth, we note that G. L. c. 258, § 10 (*c*) (1994 ed.) (Massachusetts Tort Claims Act), provides that the statute does not apply to "any claim arising out of an intentional tort, including . . . misrepresentation." Thus, under the act, the Commonwealth as a public employer is immune from suits arising from intentional torts. See *Spring* v. *Geriatric Auth. of Holyoke*, 394 Mass. 274, 284-285 (1985). Absent a "wrongful adoption" cause of action based upon negligence, adoptive parents would have no recourse against the Commonwealth for misrepresentations by a State adoption agency about a child's medical and familial background. We cannot sanction such a result.[13]

Last, the Commonwealth asserts that it is immune from liability because of the discretionary function exception to governmental tort liability. See G. L. c. 258, § 10 (*b*).[14] Spe-

---

[13]The jury having found the Commonwealth liable on the theory of negligent misrepresentation, we need not discuss whether their alternative finding of liability under the doctrine of informed consent is applicable to the facts of this case.

[14]Section 10 (*b*) provides as follows: "The provisions of sections one to eight, inclusive, shall not apply to . . . any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function

cifically, the Commonwealth contends that a State adoption agency's decision whether to disclose a child's background information to prospective adoptive parents is a decision based on public planning and policy, and thus is a discretionary act within the meaning of G. L. c. 258, § 10 (b). We disagree.

This court has concluded that principles articulated in *Whitney* v. *Worcester*, 373 Mass. 208 (1977), are helpful in determining the intended scope of the discretionary function exception contained in G. L. c. 258, § 10 (b).[15] See *Harry Stoller & Co.* v. *Lowell*, 412 Mass. 139, 141-142 (1992); *Onofrio* v. *Department of Mental Health*, 408 Mass. 605, 611 (1990), *S.C.*, 411 Mass. 657 (1992). In *Whitney, supra* at 218, we described discretionary acts as those "characterized by [a] high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning." Nondiscretionary acts, to which governmental immunity would not extend, involved "the carrying out of previously established policies or plans." *Id.*

In this case, Tompkins did not make a policy or planning judgment in deciding whether to withhold information from the plaintiffs about Elizabeth's background. Rather, according to Tompkins, she acted in accordance with an agency policy not to disclose a biological parent's mental illness to prospective adoptive parents. Thus, Tompkins's actions did not constitute a discretionary function entitled to immunity pursuant to G. L. c. 258, § 10 (b). See *Onofrio* v. *Department of Mental Health, supra* at 610-611 (immunity did not extend to negligent failure to inform boarding house owner of known incendiary proclivities of tenant placed in house,

---

or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused . . . ."

[15]Although *Whitney* v. *Worcester*, 373 Mass. 208 (1977), preceded the enactment of the Massachusetts Tort Claims Act in 1978, that opinion enunciated guiding principles for determining the scope of the discretionary function exception later stated in G. L. c. 258, § 10 (b). See *Harry Stoller & Co.* v. *Lowell*, 412 Mass. 139, 141-142 (1992), citing *A.L.* v. *Commonwealth*, 402 Mass. 234, 245 (1988).

where tenant subsequently set fire that destroyed house and its contents).

The Commonwealth asserts also that the judge erred in instructing the jury to determine whether regulations issued in 1972, 1974, or 1976 governed the disclosure of information to the plaintiffs. Assuming only for the purposes of discussion that the judge erred, we conclude that the error was harmless because the language from the regulations was essentially the same and thus could not have influenced the jurors' deliberations.

III. *The plaintiffs' cross appeal.* In their cross appeal, the plaintiffs assert that the judge erroneously instructed the jury that "Tompkins is not liable for intentional tort if the nondisclosure was pursuant to the orders of her superiors." A review of the charge, however, demonstrates that the judge did not give any such instruction.[16] We conclude therefore that

---

[16]The judge's instructions on the intentional tort claims against Tompkins were as follows:

"The last cause of action that has been brought in this case is one of fraud, deceit, and intentional tort, misrepresentation of a material fact. Insofar as negligence is concerned, negligence is the failure to exercise due care. Somebody makes a mistake. In fraud, deceit, or misrepresentation of a material fact, there is an intent on the part of the party being accused of perpetrating that particular activity. So that it is not a want of due care or a mistake, it is an intentional act with an intent to deceive, an intent to defraud, or an intent to intentionally misrepresent a fact.

"In this case the elements of this action are the misrepresentation of a material fact in this case, alleged failure to disclose knowledge of the falsity and awareness on the part of the perpetrator or the individual who's being accused of this, an awareness on their part that they are intentionally withholding material information; that they intend by withholding the information that the other party to the transaction will make reliance thereon; that the other party in fact relied upon it to their damage. Those are the elements that you must find. However, all of this is to be taken in light of the then existing rules, policies, and procedures of the Department of Public Welfare that you find there was a deviation from. And again, there is one caveat, and that is the evidence that was presented to you relative to an oral policy, you have to make a judgment and find was there or was there not. If you find there was, all of the case will be applied with respect to the written rules and regulations and that oral policy. If you find there was not, you will then apply the standards to the written policies.

"Under the law of the Commonwealth of Massachusetts, in order to recover in tort for fraud, the plaintiffs must show that the defendant made a

the plaintiffs' cross appeal is without merit, and affirm the judgment in favor of the defendant Tompkins. We also affirm the judgment for the plaintiffs as against the Commonwealth.

*So ordered.*

---

false representation of a material fact with knowledge of the falsity for the purpose of inducing the plaintiffs to act thereon, and that the plaintiffs relying upon the representation acted to their damage. It is an intentional tort. It must have been an intentional failure to disclose where there was a duty to disclose intending reliance; reliance and subsequent damage."