Fabricant, J.
INTRODUCTION
This action arises from the plaintiffs’ adoption of a pair of twin boys who turned out, after the adoption had became final, to have certain disabilities. The plaintiff parents seek to recover damages from the defendant pediatrician, as well as the corporation through which he practices, on the ground that he failed to give them medical information that would have influenced their decision to finalize the adoption. Before the Court is the defendants’ motion for summary judgment on the ground that a pediatrician has no duty to give such information in the circumstances presented here.[1] For reasons that will be explained, the motion will be allowed.
BACKGROUND
The record presents the following facts as undisputed for purposes of the present motion.[2] In the fall of 1991, the plaintiffs were planning to adopt a child or children through an adoption agency based in Newton. They informed the adoption agency, according to their joint affidavit, that “the one thing that was the most important to us was that the child be healthy. We would not adopt a ‘special needs’ child, or a child with health problems.” They met with the defendant, pediatrician Bruce Bunnell, according to their joint affidavit, and he “agreed to be the pediatrician for the child(ren) we decided to adopt.”
The adoption agency informed the plaintiffs of the birth at a Florida hospital of twin boys available for their adoption. The plaintiffs went to Florida to pick up the babies. While there, according to their deposition testimony, they learned certain information potentially relevant to the babies’ health, including that the birth was somewhat premature. They discussed this information with Dr. Bunnell by telephone, and he suggested certain additional questions they should ask regarding the babies’ medical history. The plaintiffs brought the babies back from Florida, and took them for their first examination with Dr. Bunnell on November 22, 1991. He saw them on various occasions thereafter, and addressed various health issues that arose.
The records of the Florida hospital where the birth occurred, particularly a “discharge summary,” included details regarding the birth, the mother’s health history, and the babies’ condition at and shortly after the birth. The information in the discharge summary included items that, according to Dr. Bunnell’s deposition testimony, would constitute “red flags" with respect to the children’s prognosis. Dr. Bunnell received a copy of the discharge summary, but the evidence conflicts as to when and how. His deposition testimony was that he received it from Renee Albert in the summer of 1993. Nurses who worked at the Florida hospital, however, testified that their practice was to send a copy of the discharge summary to the pediatrician “within one to two weeks.” One of those nurses recognized her handwritten notation on the copy of the discharge summary that was retrieved from Dr. Bunnell’s files in discovery. As the defendants concede for the purposes of this motion, the evidence would support an inference that Dr. Bunnell received the discharge summary in or about November of 1991, and the Court must so assume in considering the motion.
Dr. Bunnell did not discuss the discharge summary with the plaintiffs, and did not inform them of the information contained in it, or of the significance of that information with respect to the likelihood that the children would develop disabilities. Had he done so *138 prior to the finalization of the adoption, according to the plaintiffs’ affidavit, they would not have proceeded with the adoption.
In the Court’s view, the facts surrounding the plaintiffs’ engagement of Dr. Bunnell, and his undertaking toward them, are critical to the issue presented by this motion. The evidence offered on this issue is as follows. The plaintiffs’ joint affidavit recites that “(b)efore flying to Florida to meet the children, and before making the decision to adopt the boys, we met with Dr. Bruce Bunnell, who agreed to be the pediatrician for the child(ren) we decided to adopt.”[3] Robert Albert testified at his deposition in the Florida case[4] that “we enlisted Dr. Bunnell as our pediatrician-in-waiting, so to say, and as I found out information concerning the children, I called Dr. Bunnell, told him what I had heard. He then asked me to ask some questions, which I then asked.” Regarding the children’s prematurity, Robert Albert testified, “we were asking him his advice.” The following exchange then occurred:
Q . . . How did he know that you were asking him for his advice with regard to whether or not to adopt these children?
A. When we interviewed Dr. Bunnell we told him that when we got the call and they told us that a child was ready to be adopted, that we would speak to him to check out any medical problems.
Renee Albert testified at her deposition in the Florida case that “we did make our intentions known that we were an adoptive couple and that we were asking for any input that he may have according to the facts that we were given at the time .. . We asked if — we told him how — when they were born and said was there anything we should ask, in other words, what does this mean . . . but I didn’t use those exact words.” The following exchange then occurred:
Q. What does this mean in terms of — does this mean anything good or anything bad?
A. Any input.
Q. Input with regard to whether or not it should affect your decision to adopt those children?
A. Input from a medical standpoint as to whether or not there were questions that we should ask because we knew that we’d have the chance to speak to somebody about it, so we wanted to get some feedback from him as to what kind of questions would be appropriate.
Q. But the reason you were asking the questions as to what was appropriate is so that you could ask questions so that you could determine whether or not to adopt the children?
A. That was part of a determination process, yes.
Later in the deposition, Renee Albert referred to a discussion in the initial meeting with Dr. Bunnell of her nervousness about being a new mother. She related assurances he gave her, and then testified as follows:
Q. Did he tell you what you need to do to check out the adopted child to see if the child was healthy?
A. He agreed that he would check out the children for us as per the contract[5] stated.
Q. He would check them out—
A. That’s his job, because I wasn’t a medical professional. We were to see a “pediatrician” (witness gestures and indicates quotation marks) upon receiving our child and taking it to him.
Later in the deposition, in the context of relating the suggestions Dr. Bunnell made regarding questions the plaintiffs should ask of the hospital, particularly regarding the babies’ gestational age, Renee Albert testified that “I think there was an understanding between Dr. Bunnell and ourselves that we would find out if there were any risks involved with these children.” Asked why the plaintiffs brought the babies to Dr. Bunnell upon returning from Florida, she responded, “My husband and I both agreed we wanted to have Dr. Bunnell check out our children.” Asked “check out for what purpose,” she responded “general health purposes.”
The defendants in this action posed to the plaintiff an interrogatory calling upon them to “state in full and complete detail every fact of the examination, care, or treatment rendered by the Defendant . . . which you allege was negligent in any way ..." The plaintiffs’ answered:
Dr. Bunnell had in his possession the discharge summary of one or both boys, before we formally adopted them in September 1992. The information contained in those summaries was significant, material information concerning the health history, health, and condition of the birth mother and the twins. Dr. Bunnell failed to inform us of this information, or the significance of this information, as well as the significance of the twins’ prematurity.
Dr. Bunnell also gave deposition testimony on this subject. In the initial meeting, he testified, he gave the plaintiffs suggestions about questions to ask regarding the children’s and the birth mother’s medical history. The purpose of such questions, he testified, was “we can make an informed decision on these twins.” When, he saw the babies on November 22, 1991, the plaintiffs were able to provide him information such that “I got a pretty good sense of what things — where things were and what follow-up was needed.” Based on information thus obtained, he made decisions about the babies’ medical care, including arranging for certain testing in follow-up to issues the plaintiffs related as having arisen in connection with the children’s birth and post-natal condition.
Later in the deposition, Dr. Bunnell was asked and answered as follows:
*139 Q. Earlier in your deposition, you said that your role was assisting the Alberts in making an informed decision about the twins. Did you perceive you role as including helping them decide whether to finalize the adoption or whether to give the kids back?
A. Can you rephrase the question, please?
Q. Well, did the Alberts inform you that they wanted your advice in helping them decide whether to go through with the adoption?
A. I don’t recall.
Q. Did you perceive you role as including giving them advice as to whether to finalize the adoption?
A. My role would have been any aspect of the child and the family’s care.
Q. Well, but specifically, did that include a decision of — a threshold decision of whether to keep the kids?
A. It would have included any discussion concerning the welfare of the Albert twins and Mr. and Mrs. Albert.
Q. Did you perceive that as being an issue as to maybe based on information that you could help the Alberts with, that one of the options that they would consider is giving the kids back?
A. My recollection, I don’t have any recollection of that as a discussion.
Q. Were you ever asked to give an opinion as to whether the children were suitable for adoption?
A. No, I was not.
Q. In your training, or your background or experience, have you acquired an understanding of what it would mean for an infant to be suitable for adoption?
A. No, I have not.
Q. Have you ever been asked in any other circumstance to make a determination whether an infant was suitable for adoption?
A. No.[6]
Q. Based on what you knew of the Albert children, back in 1991 and 1992, would you have had an opinion that they were not suitable for adoption?
A. I’m going to answer that that I at no time was asked specifically by anybody, the parent or the adoption agency, to render any opinion concerning the adoptability of Matthew and Alex Albert.
The adoption became final in September of 1992.[7] Sometime thereafter, both children developed significant disabilities. The plaintiffs then sought and obtained records from the Florida hospital, including the discharge summary. They sued the adoption agency, the hospital, and certain individuals in a Florida court in 1996. In June of 1998, in the course of discovery in that case, they learned the information set forth supra with respect to the discharge summary having been provided to Dr. Bunnell.
The plaintiffs filed this action in November of 1998. The complaint sets forth one count against Dr. Bunnell, alleging negligence.[8] A second count alleges vicarious liability on the part of the defendant corporation as his employer. The defendants’ motion encompasses both counts.
DISCUSSION
This Court grants summary judgment where no genuine issue of material fact exists and the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing the absence of genuine dispute on every material issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The opposing party may not rest on the allegations of the pleadings, nor may it rely on “bare assertions and conclusions regarding [its own] understandings, beliefs, and assumptions.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. See Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusory statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet its burden of proof on the issues raised by the motion.
In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See Dawes, *140 369 Mass. at 553; Mass.R.Civ.P. 56(c); Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 528; see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
To prevail in an action for negligence, a plaintiff must prove that the defendant had a duty of care toward the plaintiff, that the defendant breached that duty, and that the plaintiff suffered harm as a result of the breach. The question of law presented here is whether the defendant had a duty to the plaintiffs to inform them of information in his possession affecting the children’s risk of developing disabilities, so as to inform their decision whether to adopt the children. Legal duty “finds its ‘source in existing social values and customs.’ ” Mullins v. Pine Manor College, 389 Mass. 47, 51 (1983), quoting Schofield v. Merrill, 386 Mass. 244, 247 (1982). As that case illustrates, the existence of a duty arising from a special relationship between the parties depends on whether persons in the position of the defendant customarily take precautions against the type of risk in issue, whether persons in the position of the plaintiff customary expect persons in the position of the defendant to do so, and whether the nature of the situation is such that the defendant is in a better position than the plaintiff to take such precautions. Id. Aside from those factors, “a duty voluntarily assumed must be performed with due care.” Id. at 52.
In arguing that Dr. Bunnell had a duty in this instance, the plaintiffs rely on three cases: Harnish v. Children’s Hospital Medical Center, 387 Mass. 152 (1982); Viccaro v. Milunsky, 406 Mass. 777 (1990); and Mohr v. Commonwealth, 421 Mass. 147 (1995). Each of those cases differs from the facts presented here in significant respects.
The plaintiffs in Viccaro v. Milunsky, 406 Mass. 777 (1990), were a couple who, while anticipating marriage and the decision whether to have children, consulted the defendant, a physician specializing in genetics, genetic disorders, and genetic counseling, with respect to the specific question of whether the wife had or was a carrier of a particular genetic disease. The defendant advised the plaintiffs that she “did not have the disease and that there should be no likelihood of her developing the disorder or of having affected children.” Id. at 778. The plaintiffs conceived in reliance on that advice, which proved incorrect; their son was born “severely afflicted.” Id. They sued in federal district court, which certified to the Supreme Judicial Court the question “[d]oes Massachusetts recognize a cause of action for wrongful birth, where the parents of a minor child afflicted with a genetic defect allege that the negligent pre-conception genetic counseling by a geneticist induced the parents to conceive and give birth to the child?” Id. at 779, n. 4. The Court answered the question in the affirmative, and held that damages for such a claim would be in the amount of the “extraordinary medical, education, and other expenses that are associated with and are consequences of the disorder.” Id. at 780. The crucial difference between this case and Viccaro lies in the roles undertaken by the physicians. There, on the facts as recited in the decision, the geneticist was consulted for the specific and explicitly identified purpose of advising the plaintiffs regarding the particular risk that eventually materialized. He undertook that specific task, and then performed it negligently. Under those circumstances, the Supreme Judicial Court had no difficulty concluding that he had a duty to exercise due care in the performance of his undertaking, and could be held liable for breach of that duty.
Here, the evidence offered, as recited supra, considered in the light most favorable to the plaintiffs, does not establish any comparable undertaking on the part of Dr. Bunnell. Although the plaintiffs’ testimony, along with their affidavit, could be understood to indicate that they were looking to him for information that would influence their decision whether to adopt the children, no evidence indicates that they ever told him they were doing so, that they ever asked his advice on that question, or that they ever asked him specifically about whether the children had risk factors for future disabilities. Most importantly, no evidence indicates that he ever undertook or agreed to give advice about the adoption decision, to express an opinion whether the children had such risk factors, or to do anything other than fulfill the normal role of a pediatrician for the children. To the contrary, Dr. Bunnell testified that he was never asked for and never gave an opinion on the adoption decision, and the plaintiffs do not contradict that testimony.
The plaintiffs focus on Dr. Bunnell’s testimony that his role included “any discussion concerning the welfare of the Albert twins and Mr. and Mrs. Albert.” That testimony must be considered in its context. The context, as described in the plaintiffs’ own affidavit, was that Dr. Bunnell “agreed to be the pediatrician for the child(ren) we decided to adopt.” His obligation, as the children’s pediatrician, was to advance their health interests. The adoptive parents’ welfare would tend to bear on the children’s health, so that his role as their pediatrician might include discussion of a broad range of matters affecting the family overall. His recognition of that broad role, however, does not amount to a specific undertaking to advise on the adoption decision, or to alert the parents to information that might influence them not to adopt. Indeed, his doing so might have been inconsistent with the role he undertook as the children’s pediatrician; it is difficult to imagine how a decision by these plaintiffs not to adopt the children would have served the children’s health interests.
Harnish v. Children’s Hospital Medical Center, 387 Mass. 152 (1982), arose in quite a different context. The plaintiff there alleged that the defendant surgeon obtained her consent to a surgical procedure without *141 informing her of a material and foreseeable risk, and that had she been so informed she would not have consented. The risk materialized, and the patient sought damages. In those circumstances, the Court held that “a physician’s failure to divulge in a reasonable manner to a competent adult patient sufficient information to enable the patient to make an informed judgment whether to give or withhold consent to a medical or surgical procedure constitutes professional misconduct.” Id. at 154-55. The Court relied on the principle that ”[i]t is the prerogative of the patient, not the physician, to determine . . . the direction in which . . . his interests lie.” Id. at 154, quoting Cobbs v. Grant, 8 Cal. 3d 229, 242 (1972). By obtaining the patient’s consent to the procedure without disclosing material risks, the physician had effectively usurped the patient’s right to weigh the risks and benefits of the procedure.
Here, the defendant neither recommended nor performed any medical procedure on these plaintiffs.[9] As far as the record discloses, the information in issue did not bear on any decision to be made about medical treatment. The information did bear on an important decision the plaintiffs were making, but that decision is not analogous to the one in Harnish, for purposes of the plaintiffs’ claim against this defendant, because the defendant’s role with respect to the decision was entirely different from the surgeon’s role in Harnish with respect to the surgery. This defendant did not “perform” the adoption, as the surgeon there performed the surgery. Nor does anything in the evidence indicate that the defendant recommended the adoption, advised or encouraged the plaintiffs to proceed with it, or took any position with respect to it. In the absence of any such conduct on his part, his failure to provide information that would have been material to the decision cannot constitute a usurpation of the plaintiffs’ decision making power.
Mohr v. Commonwealth, 421 Mass. 147 (1995), applied the doctrine of informed consent to an adoption decision, but imposed liability on a defendant in aróle quite different from that of Dr. Bunnell here. The defendant found liable in Mohr was the state agency then known as the Department of Public Welfare, which had placed the child with the plaintiffs for adoption without disclosing to them information in its possession indicating that the child’s birth mother was schizophrenic and that the child had exhibited manifestations of mental retardation. On these facts, the Supreme Judicial Court held that “an adoption agency does have an affirmative duiy to disclose to adoptive parents information about a child that will enable them to make a knowledgeable decision about whether to accept the child for adoption.” Id. at 161.
The defendant in Mohr, unlike Dr. Bunnell here, was directly involved in the adoption decision, and in fact actively solicited the plaintiffs to adopt the child. Moreover, the defendant controlled access to the child’s records, which included the information that it failed to disclose to the parents. Under those circumstances, the Court’s recognition of liability is hardly surprising. Indeed, the Department’s role in the adoption decision was comparable to that of the surgeon in Harnish, who actually performed the procedure in issue, without adequate disclosure. Dr. Bunnell, in contrast, had no role in the adoption.
On the facts presented here, any liability on the part of Dr. Bunnell would have to be predicated not a duty arising from his particular role with respect to the plaintiffs’ adoption decision, but on a duty applicable to pediatricians generally to volunteer information to prospective adoptive parents about matters in a child’s medical history affecting the child’s risks of future disability. Such a duty, if it exists, must arise from “existing social values and customs.” Mullins v. Pine Manor College, 389 Mass. at 51. The plaintiffs have offered no evidence to indicate that pediatricians customarily volunteer such information, or that prospective adoptive parents customarily expect pediatricians to do so. Compare Id. at 51-54 (discussing evidence presented at trial regarding customary practices of colleges in providing security for students, and likelihood that prospective students and parents consider such practices in selecting a college).[10]
Nor does the relationship between prospective adoptive parents and their pediatrician generally place the latter in the best position to take precautions against unidentified risk factors. Id. at 51 -52. Prospective adoptive parents are in the best position, certainly better than any physician they might consult, to know their own attitudes with respect to the risk that a child they might adopt would develop disabilities. A couple who wants to avoid adopting a child who may be subject to particular risk factors is free to make an explicit request of a pediatrician or other expert to review the child’s medical or family history and opine about the child’s prognosis. Such a request would put the physician in a position either to undertake to give such advice, thereby assuming a duty to exercise due care in doing so, or to decline that role, leaving the couple free to seek out another source of advice on that subject. As discussed supra, however, no such explicit request or undertaking occurred here. Accordingly, the Court concludes that Dr. Bunnell had no duty to volunteer the information in issue, and can have no liability for failing to do so.
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motion for Summary Judgment is ALLOWED.

Defendants also argue that the action is barred by the statute of limitations. For reasons that will become apparent, the Court will not address that argument.

The moving parties have not fully complied with the requirements of Superior Court Rule 9A(b)(5); the statement submitted, purportedly pursuant to that rule, summarizes the pleadings and asserts certain propositions of law, but does not set forth the facts that the moving parties contend *142 are undisputed, with supporting references to evidentiary materials. Nevertheless, it appears from the materials submitted, which are of manageable quantity, that the material facts are not genuinely disputed, and that the issue presented by this motion is solely one of law. For that reason, in the exercise of discretion, the Court will consider the motion based on the materials submitted, despite the lack of full compliance with the rule.

Dr. Bunnell answered an interrogatory in similar terms, indicating that he first met the Alberts at a “prenatal visit" on September 27, 1997, when they "informed me that they were planning on adopting a baby and asked if I would be their children’s M.D. We discussed what to expect from a newborn, office routines /policies, and the fact that Adoptions with Love was the agency they were using and this agency would call with less than 24 hour notice concerning possible adoption.”

Neither party has raised any issue as to the propriety of the Court’s considering deposition testimony given in the Florida case for purposes of this motion.

The “contract” referred to, as far as the Court can determine from the materials submitted, was that between the plaintiffs and the adoption agency, which apparently (no copy has been provided) included provision for the adoptive parents to have the child examined by a pediatrician. Nothing in the record suggests the existence of any written contract between the plaintiffs and Dr. Bunnell.

Dr. Bunnell later corrected this answer to add that on one occasion he had been asked to give an opinion “on the adoptability of a little girl about six years ago from Romania, based on some videotaping that the parents were able to provide to me.”

Dr. Bunnell testified that he was unaware of the occurrence of that event. No contrary evidence appears in the materials submitted.

The language employed in the complaint tracks the elements of a claim of negligent misrepresentation, rather than one of medical malpractice.

He did, apparently, recommend and perform various medical procedures on the children; no claim is made that he did not obtain the plaintiffs’ informed consent, on behalf of the children, to those procedures.

The plaintiffs have offered the affidavit of their proposed expert, Maryland pediatrician Dr. Alan Bedrick, who opines that “if Dr. Bruce Bunnell had in his possession the Discharge Summaries before the adoptions were formalized in September 1992, then he deviated from the standard of acceptable medical care in failing to disclose to the Alberts” specified information. This opinion addresses the issue of negligence, but does not address the element of duty. Dr. Bedrick does not express any opinion as to whether pediatricians customarily volunteer such information outside the context of a consultation explicitly directed toward assessing a prospective adoptive child’s risk of developing future disabilities.